**AMERICAN RE–INSURANCE COMPANY, a Delaware Corporation, Appellant,**

v.

**William J. JANKLOW, individually and as Governor of the State of South Dakota; Vernon L. Larson, individually and as Auditor of the State of South Dakota; Tim Engelhart, individually and as Director of the Bureau of Administration of the State of South Dakota; James E. Brinkman, individually and as Director of the Department of Purchasing and Printing of the State of South Dakota; the Bureau of Administration of the State of South Dakota; and the State of South Dakota, Appellees.**

No. 81–1680.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1981.

Decided April 23, 1982.

Gary E. Davis, C. Rick Johnson, Johnson, Johnson & Eklund, Gregory, S. D., Mark Meierhenry, Atty. Gen., Pierre, S. D., for appellees.

Lawrence L. Piersol, Mark Marshall, Staff Atty., Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., James M. Samples, Stephen D. Bell, Faegre & Benson, Minneapolis, Minn., for appellant American Re-Insurance Co.

Before GIBSON, Senior Circuit Judge, BRIGHT, Circuit Judge, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

The plaintiff, American Re-Insurance Company, appeals from the district court's *sua sponte* dismissal of those portions of its complaint that sought injunctive and declaratory relief. The district court determined that such relief was barred by the Eleventh Amendment because the State was the real party in interest and the relief sought was in essence specific performance of a contract, which would require the payment of money from the State treasury. We reverse the district court's decision insofar as it applies to the individual appellees, and reinstate appellant's complaint against them for injunctive and declaratory relief.

## I. BACKGROUND

In March 1976 the Bureau of Administration of the State of South Dakota entered into a lease for an IBM 370/158 computer with a company known as CIG Marketing Corporation (CIG). The lease was for an initial term of seven years and provided for annual payments of rent due on July 1 of each year for the following twelve months.[1] These rental payments were to be made from the Central Data Processing Fund established by Section 1–14–12.3 of the South Dakota Codified Laws. The revenues of this fund were derived from fees charged by Central Data Processing (CDP) to agencies and political subdivisions that used the data processing services offered by CDP. *See* S.D.Codified Laws Ann. § 1–14–12.5 (1980).

After entering into the lease CIG transferred its interest in the computer equipment and the lease to The Connecticut Bank and Trust Company under a trust agreement that named CIG as the sole ben-

---

* Earl R. Larson, United States Senior District Judge, District of Minnesota, sitting by designation.

1. The Bureau could terminate the lease any June 30 by paying the "residual value" of the computer equipment as defined in the lease and could also "fund out" in the event the Legislature failed to appropriate funds for data processing services in any year.

eficiary. CIG then caused Connecticut Bank to borrow $1,759,503 from Aetna Casualty and Surety Company to finance a portion of the purchase price of the computer equipment leased to the Bureau.[2] Aetna took a security interest in the computer equipment and an assignment of Connecticut Bank's rights under the lease as collateral. Thereafter, Aetna assigned its interest in the loan and its right to receive loan payments to appellant American Re-Insurance Company.

The lease was amended twice: the first amendment in June 1976 effected certain changes as a result of the above financing arrangements and made certain revisions in the rental rates and residual values under the terms of the lease.[3] The second amendment made two minor changes effective July 1, 1976. At the time the lease agreement was signed, Richard Kneip was Governor, William Janklow was Attorney General, and James Brinkman was Director of the Bureau's Department of Purchasing and Printing. The lease and the amendments were signed by James Brinkman in his official capacity, and both the original lease and the first amendment were approved as to form by the Attorney General's office in 1976.[4] In 1978, the Legislature of South Dakota enacted a statute that provided: "The director of purchasing and printing may contract for the lease of automatic data processing equipment for state agencies. Such contracts may not exceed five years." 1978 S.D.Sess.Laws, ch. 7, § 1 (codified at S.D.Codified Laws Ann. § 1–14–12.6 (1980)). Later that same year Janklow was elected Governor and Vernon Larson was elected State Auditor.

The Bureau made five annual rental payments under its lease with CIG in 1976, 1977, 1978, 1979, and 1980. On February 24, 1981, with two years remaining on the seven year lease, Larson wrote a letter to American indicating that he had issued a stop-order on further rental payments under the lease. Larson stated:

The grounds for issuance of this stop-order are that the undersigned, based upon the advice of legal counsel, has determined that the lease agreement which is the basis for said payment is illegal, unauthorized and improper. This determination is made based upon my counsel's finding and advice that:

(a) The Bureau of Administration did not have the lawful power or authority to enter into the agreement.

(b) The Bureau of Administration did not have, in 1976, the lawful and constitutional authority to enter into long term contracts which would interfere with the ability of subsequent administrations to properly handle the needs of government. In this case, I am advised that the data system has proved to be inadequate to permit the present administration to efficiently operate its programs.

(c) The legislature did not authorize the Bureau of Administration to enter into any long term contracts until after 1976, and they authorized only five year leases.

(d) It further appears that in the absence of a specific appropriation pursuant to law for the lease payments, that further payments upon the same would violate Section 9 of Article XI of our State Constitution and Section 3 of Article XII of our State Constitution.

2. At the TRO hearing, evidence was presented that the purchase price of the IBM 370/158 computer system obtained by CIG for lease to the Bureau was approximately $2,200,000. The current market value is approximately $50,000.

3. CIG was selected by the Bureau as the successful bidder in a public bidding process. The Bureau then requested, consistent with the bidding documents, that CIG provide an upgraded system, which required the revisions made in the first amendment.

4. Attorney General Janklow also wrote two opinion letters upholding the legality of the advance payment and "funding out" provisions of the lease. Appellees attach another letter written by Janklow in June 1977 in which he expresses an opinion on the advisability of entering into long term leases in "areas which change as rapidly as computer science." This letter is not part of the record on appeal, see Fed.R.App.Pro. 10, and accordingly we give it no consideration.

(e) From my review of the situation, it appears that the Attorney General did not approve the term of this lease at the time that it was signed by the Bureau of Administration.

On March 17, 1981, American filed a notice appealing Larson's stop-order to the State Board of Finance.[5] Governor Janklow ratified Larson's action in a letter to Aetna dated April 24, 1981, in which Janklow stated that he was "convinced that the alleged contract entered into between the state and CIG has been void since its inception."

On June 1, 1981, the Bureau issued a letter of intent to purchase replacement computer equipment from Comdisco, Inc. This sale was closed on June 3,[6] the same date that American commenced this action against the State of South Dakota, the Bureau of Administration, and Governor William Janklow, State Auditor Vernon Larson, Director of the Bureau of Administration Tim Engelhart, and Director of the Bureau's Department of Purchasing and Printing James Brinkman, in their individual and official capacities. In Count I of its complaint, American alleged that the actions of Janklow, Larson, Engelhart, and Brinkman have resulted in the violation of American's constitutional rights, specifically its rights to equal protection, due process, and freedom from the impairment of contract. In Count II American alleged a violation of its civil rights under 42 U.S.C. § 1983. In Count III American sought a declaration that the CIG lease is valid, lawful, and binding and that the 1978 S.D.Sess. Laws, ch. 7, § 1 (codified at S.D.Codified Laws Ann. § 1–14–12.6 (1980)) is unconstitutional as applied to the lease. Finally, American alleged in Count IV that Janklow and Larson have tortiously interfered with a valid contract. As relief for this conduct, American sought an injunction restraining the appellees from violating American's rights, a declaration that the lease is valid, lawful, and binding and that S.D.Codified Laws Ann. § 1–14–12.6 (1980) is unconstitutional as applied to the lease, damages against the individual appellees, and attorneys' fees.

American filed a petition for a temporary restraining order, and the district court heard American's petition on June 11, 1981. Later that same day the district court issued an Order and Memorandum Order denying the motion for a TRO and dismissing those portions of American's complaint that sought injunctive and declaratory relief.[7] The district court determined that its jurisdiction was barred by the Eleventh Amendment since "the injunctive and declarative remedies which [American] seeks are ones which would result in a monetary liability for the State of South Dakota rather than for the individual [State officials]." *American Re-Insurance Co. v. Janklow*, No. 81–4090, slip op. at 8 (D.S.D., filed June 11, 1981). American appeals from this dismissal of its complaint, alleging that the district court erred because its claims for injunctive and declaratory relief are not barred by the Eleventh Amendment, the district court should not have acted *sua sponte* but rather should have given American an opportunity to address fully the Eleventh Amendment issues, and, finally, the Eleventh Amendment does not apply because there has been a waiver and in any event no funds from the State treasury are directly involved because of the structure of the funding mechanism under the CDP Fund.

## II. DISCUSSION

◼ The issue presented in this appeal is whether the Eleventh Amendment[8] bars the type of relief sought by the appellant in

---

5. The State Board of Finance is composed of eight members, three of whom include appellees Janklow, Larson, and Engelhart. *See* S.D. Codified Laws Ann. § 4–1-1 (1980).

6. The Bureau paid $150,000 for this equipment.

7. The district court did not dismiss American's § 1983 claims against the individual appellees.

8. The Eleventh Amendment provides:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

this case. The district court reasoned that the object of the injunctive and declaratory aspects of American's suit was to compel specific performance of the CIG lease, including the continued payment of rent,[9] which would impose on the State "a liability which must be paid from public funds in the state treasury." *American Re-Insurance Co. v. Janklow, supra,* slip op. at 6 (citing *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–1356, 39 L.Ed.2d 662 (1974)). Of course, "the nature of a suit as one against the state is to be determined by the essential nature and effect of the proceeding," *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945) (citations omitted), but we do not believe that in this case "the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Id.* At this early stage of the proceedings,[10] appellant American should be given the opportunity to develop its claims against the appellee State officials for their alleged unconstitutional and tortious conduct.

It is well-settled that "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury." *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979) (citations omitted). Federal courts have rejected the Eleventh Amendment defense and have ordered State officials to reinstate employees, *see Board of Trustees of Arkansas A & M College v. Davis,* 396

F.2d 730, 732–34 (8th Cir.), *cert. denied,* 393 U.S. 962, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968); *Brook v. Thornburgh,* 497 F.Supp. 560, 561–62 (E.D.Pa.1980), and to make improvements in conditions in State prisons and State institutions for the mentally retarded, *see Welsch v. Likins,* 550 F.2d 1122, 1131–32 (8th Cir. 1977), and *Holt v. Sarver,* 442 F.2d 304, 306–07 (8th Cir. 1971), *cited in MacBride v. Exon,* 558 F.2d 443, 447–48 (8th Cir. 1977), recognizing that compliance with such prospective injunctive relief may well require the expenditure of State funds. The Eleventh Amendment is thus no bar if the relief appellant seeks can be fairly characterized as "a necessary consequence of compliance in the future with a substantive federal-question determination." *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). Both the injunctive and declaratory aspects of appellant's complaint may be characterized as such.[11] Appellant has not asked for the rent due under the lease as damages, and the injunctive and declaratory relief sought by plaintiff is not equal to specific performance of the lease: for this reason we reject the district court's determination that *Litton Industries, Inc. v. Colon,* 587 F.2d 70 (1st Cir. 1978), is controlling.

We find that American alleges colorable due process, equal protection, and contract clause claims that are not "clearly ... immaterial and made solely for the purpose of obtaining jurisdiction or ... wholly insubstantial and frivolous." *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). Accepting appellant's allegations as true for the purpose of reviewing the district court's dismissal of its com-

---

9. The annual rent due July 1, 1981, was $363,-502. A similar amount will be due July 1, 1982. The "residual value" of the lease as of June 30, 1981, was $826,088; as of June 30, 1982, this value declines to $532,615.

10. The only motion considered by the district court was American's motion for a TRO eight days after it had filed its complaint. Only Governor Janklow and the State prepared a memorandum in opposition to this motion, and counsel for these two appellees alone appeared at the TRO hearing.

11. In its prayer for relief, American seeks in relevant part:
 A. An injunction restraining Defendants, and each of them, from violating American's constitutional rights, civil rights, and other rights;
 B. A judgment declaring the Lease lawful, valid and binding on the Bureau and the State of South Dakota;
 C. A judgment declaring Session Law 1978, Chapter 7, § 1, SDCL 1–14–12.6, unconstitutional as applied to the Lease.

plaint, *see Jackson Sawmill Co. v. United States*, 580 F.2d 302, 306 (8th Cir. 1978), *cert. denied*, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 35 (1979) (citing *Bramlet v. Wilson*, 495 F.2d 714, 716 (8th Cir. 1974)); *Springfield Television, Inc. v. City of Springfield*, 428 F.2d 1375, 1376 (8th Cir. 1970), appellees have relied upon S.D.Codified Laws Ann. § 1–14–12.6 (1980) in issuing the stop-payment order after the lease had been in effect for five years.[12] Appellees now refute this contention by claiming that they did not rely in any way on this statute, but their memorandum in opposition to American's motion for a TRO specifically stated that granting the TRO would require them to "make payments on an illegal contract pursuant to SDCL §§ *1–14–12.6* and 5–23–19.1." (emphasis added). Moreover, appellee Larson offered in his letter to American that one of the grounds for the stop-order was that "[t]he legislature did not authorize the Bureau of Administration to enter into any long term contracts until after 1976, and *they authorized only five year leases.*" (emphasis added). Although appellees had been in office since 1978, they did not act to stop lease payments until 1981—after the lease had been in force for *five* years.

 The contracts clause does not absolutely forbid impairment of a private contract by the State, but the State must establish that such impairment was justified. Appellees may have a reasonable justification for their actions,[13] but appellant has alleged sufficient facts at this stage of the proceedings to preclude dismissal of its contracts clause cause of action. *See White Motor Corp. v. Malone*, 599 F.2d 283, 287 (8th Cir.), *aff'd,* 444 U.S. 911, 100 S.Ct. 223, 62 L.Ed.2d 166 (1979). Appellees' assertion that *Jackson Sawmill Co. v. United States*, 580 F.2d 302 (8th Cir. 1978), *cert. denied*, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 35 (1979), defeats appellant's contract clause claim is misplaced. In *Jackson Sawmill,*

this Court affirmed the district court's dismissal of a complaint filed by bondholders against the City of East St. Louis, the states of Illinois and Missouri, the United States, and several State, local, and Federal officials, alleging inverse condemnation and impairment of contract. The bonds purchased by the plaintiffs were issued by the City under a trust agreement to finance improvements to a bridge. The trust agreement provided that both principal and interest on the bonds would be paid from tolls and stipulated that the City would not permit construction of a rival bridge. After the improvements were made, the City, State, and Federal governments built another bridge, which reduced revenue from the first bridge and caused the City to default on the bonds. In affirming the district court's dismissal of the impairment of contract cause of action, this Court specifically found that "*no* attempt was made to use the law, federal or state, to repudiate a contractual obligation." *Id.* at 312 (emphasis added). In the present case, American has asserted a colorable claim that State officials have used the law in such a fashion.

 In addition to its contract clause claim, American has alleged sufficient facts to be given the opportunity to develop its assertion that the application of S.D.Codified Laws Ann. § 1–14–12.6 (1980) to the lease denies it equal protection because it creates a classification of one that is irrational, arbitrary, and unreasonable. *See United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534–35, 93 S.Ct. 2821, 2825–2826, 37 L.Ed.2d 782 (1973); *Williams v. Illinois*, 399 U.S. 235, 242, 90 S.Ct. 2018, 2022–2023, 26 L.Ed.2d 586 (1970). Finally, American has alleged a colorable claim that its due process rights have been violated because its property right under the lease was adversely affected without the appro-

12. The statute provided for a five year maximum. *See* S.D.Codified Laws Ann. § 1–14–12.6 (1980).

13. Appellees also stated in their memorandum in opposition to American's request for a TRO that "the State contends that SDCL 1–14–12.6

... is necessary to protect and maintain the integrity of the state budget process by preventing one legislature from binding future legislatures to excessive, long-term budget expenditures."

priate procedures and without the benefit of a neutral decision-maker. *See, e.g., Gibson v. Berryhill*, 411 U.S. 564, 571–72, 578–79, 93 S.Ct. 1689, 1694, 1697–1698, 36 L.Ed.2d 488 (1973); *Mobil Oil Corp. v. Kelley*, 493 F.2d 784, 787–88 (5th Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). A prospective injunction, prohibiting further unconstitutional actions or tortious interference with the lease agreement should appellant prove its case, may be appropriate. *See Municipal Authority of the Town of Bloomsburg v. Commonwealth of Pennsylvania*, 496 F.Supp. 686, 690 (M.D.Pa.1980). *Cf. New England Patriots Football Club, Inc. v. University of Colorado*, 592 F.2d 1196 (1st Cir. 1979) (Eleventh Amendment does not bar injunction against State officials to prohibit tortious interference with a contract). *See generally Alcala v. Burns*, 494 F.2d 743, 746 (8th Cir. 1974), *rev'd on other grounds*, 420 U.S. 575, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975); *Anderson v. Graham*, 492 F.2d 986, 991 (8th Cir. 1973). As we have already determined, such relief is not tantamount to an impermissible retroactive damages claim. *See id.; Jackson Sawmill Co. v. United States*, 580 F.2d at 309–10.

Appellant's declaratory relief is also not barred by the Eleventh Amendment. Appellant seeks two declaratory judgments: one, that the lease is valid, lawful, and binding; the other, that S.D.Codified Laws Ann. § 1–14–12.6 (1980) is unconstitutional as applied to the lease in question. If the district court finds this relief to be warranted, these declarations would be permissible under the Eleventh Amendment because they would not automatically require the payment of any funds under the lease. *See, e.g., Municipal Authority of the Town of Bloomsburg v. Commonwealth of Pennsylvania*, 496 F.Supp. at 689. A declaratory judgment does not carry any coercive force, *id.*, but American could use such a declaration in taking its case to the State Legislature under S.D.Codified Laws Ann. §§ 21–32–1 through 21–32–7 (1980),[14] which might result in legislative action to pay money due under the lease to American. In any event, the Federal court would only be defining the rights of the parties: "whether or not [American] will receive retroactive benefits rests entirely with the State, its agencies, courts, and legislature, not with the federal court." *Quern v. Jordan*, 440 U.S. at 348, 99 S.Ct. at 1149 (footnote omitted).

Thus, we have concluded that the declaratory and injunctive portions of American's complaint must be reinstated against the four individual appellees in their individual and official capacities. We agree, however, with the district court's *sub silentio* determination that the State itself did not consent to suit in Federal court on this matter. None of the statutory provisions cited by American[15] nor the Bureau's action in entering into the lease in question[16] constitute the "express language" or "overwhelming implications" of waiver that "leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. at 673, 94 S.Ct. at 1360–1361 (citing *Murray*

---

14. These sections establish a mechanism for making claims against the State. American can file a petition in the form of a complaint with the clerk of court in the county in which the claim arose. A circuit judge is appointed to act as commissioner of claims. The commissioner holds a hearing and submits findings to the Governor, who is required to submit them to the next session of the Legislature for "consideration, compromise, settlement, or rejection." In other words, the commissioner's findings are advisory only. *See* S.D.Codified Laws Ann. § 21–32–7 (1980).

15. *See* S.D.Codified Laws Ann. §§ 1–14–1 *et seq.*; 21–32–15 and 21–32–16 (1980).

16. Article 15 of the lease, entitled "Assignment," provides in part:

Lessee [the Bureau] shall not assert any defense, right of setoff or counterclaim which it may have against Lessor, arising hereunder or otherwise, against any bank, financial institution or other lender to which Lessor or its assignee shall have assigned any or all of its rights and interest hereunder.

The Attorney General's letter regarding the "funding out" provision, dated January 20, 1976, states that "such a provision is of importance as a protection from potential liability in a breach of contract action." These provisions and statements—when placed in their proper context—do not establish waiver in a Federal court action.

*v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)). Because the State has not consented to this suit, its Eleventh Amendment immunity remains intact. This immunity also applies to the Bureau of Administration if the Bureau is an "alter ego" or agent of the State rather than an independent entity. *See* 1 *Moore's Federal Practice* ¶ 0.60[2.–2] at 614 (2d ed. 1981). No State court has yet determined the status of the Bureau in this regard, but we agree with appellees that the Bureau is an integral part of the Executive Branch of State government.[17] The district court was thus correct in dismissing appellant's complaint as to the Bureau and the State. *See Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3058, 57 L.Ed.2d 1114 (1978) (per curiam).

In dismissing appellant's complaint *sua sponte*, however, the district court failed to consider whether the Eleventh Amendment would apply to any payment ordered to be made from the CDP Fund, that is, whether the money in the Fund can be considered to be the same as funds from the State's general revenues. *See Edelman v. Jordan*, 415 U.S. at 665, 94 S.Ct. at 1357. The CDP Fund was created under S.D.Codified Laws Ann. § 1–14–12.3 (1980) specifically to pay the expenses of the data processing service operated under Section 1–14–12.2. Data processing services are provided to any "department, agency, commission, institution, or any other units of state government and for any of the political subdivisions of the state," S.D.Codified Laws Ann. § 1–14–12.2 (1980), and fees from each of the above users are collected by the CDP and deposited in the CDP Fund in the State treasury. The agencies of the State using the computer services pay these fees from the general appropriation made to the agency by the Legislature. Any political subdivision that uses the services pays its fees from funds derived from taxes or other sources of revenue that may be available.[18]

Because annual payments under the CIG lease agreement are made in advance from the CDP Fund and because in some sense the CDP Fund is separate from other, general revenues or funds in the State treasury, appellant argues that even if the district court were to order appellees to make payments to American from the Fund, such an order would have no true impact on the State treasury and thus would not be prohibited by the Eleventh Amendment. This theory is not without merit. In *Schiff v. Williams*, 519 F.2d 257 (5th Cir. 1975), for example, the district court granted a back pay award to editors of a school newspaper from a fund composed of payments made by students of Florida Atlantic University as part of their activity fee. The Court of Appeals affirmed this award on the grounds that the fund was limited to those expenditures that would benefit the student body, which included the operating expenses of the school paper, and the fund was not the property of the State of Florida, but was only held in trust for the benefit of the students. *Id.* at 262, n.2. *See Municipal Authority of the Town of Bloomsburg v. Commonwealth of Pennsylvania*, 496 F.Supp. at 692 (fund of Federal grant awards under § 206(a) of the Federal Water Pollution Control Act Amendments of 1972 paid to the State may not be money in the State treasury); *Bowen v. Hackett*, 387 F.Supp. 1212, 1220–21 (D.R.I.1975) (money in State's Employment Security Fund and Temporary Disability Insurance Fund was not money in the State treasury subject to the Eleventh Amendment). Appellant has not specifically requested any retroactive damage award in its complaint, but on remand the district court should also consider, if appropriate, whether an Order directing the payment of a retroactive damage award from the CDP Fund is barred by

---

**17.** *See* S.D.Codified Laws Ann. ch. 1–14; §§ 1 33 2 through 1–33–3 (1980) (Bureau controls computer lease matters; Bureau is under the Office of Executive Management which is headed by the Governor). *See generally George R. Whitten, Jr., Inc. v. State University Construction Fund*, 493 F.2d 177 (1st Cir. 1974)

(Construction Fund protected by State's Eleventh Amendment immunity).

**18.** *See* Attorney General Janklow's letter to Aetna Casualty and Surety Company, dated June 17, 1976.

the Eleventh Amendment because such funds "must inevitably come from the general revenues of the State." *Edelman v. Jordan*, 415 U.S. at 665, 94 S.Ct. at 1357.

Accordingly, we affirm the district court's dismissal of the appellant's complaint against the State and Bureau of Administration, but reverse and reinstate appellant's complaint against the four State officials in their individual and official capacities.