**TM PARK AVENUE ASSOCIATES,**
**Plaintiff,**

**W.E.A. Associates, Plaintiff–Intervenor,**

**John Hancock Mutual Life Insurance**
**Company, Plaintiff–Intervenor,**

**v.**

**George E. PATAKI, Individually and as Governor of the State of New York; H. Carl McCall, Individually and as the Comptroller of New York State; New York State Department of Audit and Control; State University of New York; Frederick Salerno, Individually and as Chairman of the Board of Trustees of the State University of New York; Board of Trustees of the State University of New York; Thomas A. Bartlett, Individually and as Chancellor of the State University of New York; Lonnie Clar, Individually and as Associate Counsel to the State University of New York; Irving Freedman, Individually and as Vice Chancellor of Capital Facilities of the State University of New York and General Manager of the State University Construction Fund; New York State Dormitory Authority; The State of New York, Defendants.**

No. 95–CV–1480.

United States District Court,
N.D. New York.

Oct. 21, 1997.

---

the State of NY, of counsel, Albany, NY, for Defendants.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

### I. Background

#### A. Procedural history

Plaintiff TM Park Avenue Associates' ("TM") initiated this action against the State of New York, numerous state entities and various state officials both in their official and individual capacities. TM contends, *inter alia*, that a New York statute, Chapter 312 of the Laws of 1995, violates the Contract Clause of the United States Constitution, as it substantially impairs TM's long-term lease with the State University of New York ("SUNY").

Now before this Court are three summary judgment motions. First, TM moves for an order granting summary judgment declaring the enactment of Chapter 312 of the Laws of 1995 violative of the Contract Clause of the United States Constitution, and enjoining the defendants from terminating payments to TM under the authority of Chapter 312.[1] Alternatively, should this Court not grant summary judgment, TM seeks an order preliminarily enjoining defendants from terminating payments under authority of Chapter 312 during the pendency of the litigation. Second, plaintiff-Intervenors John Hancock Mutual Life Insurance Company ("Hancock") and W.E.A. Associates ("WEA") also move for summary judgment, similarly challenging the constitutionality of Chapter 312. Third, defendants cross move for summary judgment, asserting that Chapter 312 of the Laws is constitutional in all respects. Defendants further request an order dismissing plaintiffs' claim that Chapter 312 violates the Due Process Clause of the Fourteenth Amendment.

For the reasons that follow, plaintiffs' motions for summary judgment are granted in part and denied in part, and defendants' motion for summary judgment is granted in part and denied in part.

Office of Ronald H. Sinzheimer, Ronald H. Sinzheimer, of counsel, Albany, NY, for Plaintiff TM Park Avenue Associates.

Rosenman & Colin, LLP, David J. Mark, of counsel, New York, NY, for Plaintiff-Intervenor W.E.A. Associates.

Debevoise & Plimpton, P. Bradley O'Neill, of counsel, New York, NY, for Plaintiff-Intervenor John Hancock Mutual Life Ins. Co.

Dennis C. Vacco, Atty. Gen. of State of N.Y., Steven H. Schwartz, Asst. Atty. Gen. of

---

1. The Real Estate Board of New York, Inc. has submitted an *amicus curiae* brief in support of the plaintiffs' motion for summary judgment.

### B. Facts

TM is the owner of 315 Park Avenue South in New York City. In April 1986, TM and SUNY entered into a new lease whereby SUNY leased space at 315 Park Avenue South for its College of Optometry. The lease commenced on April 17, 1986, with an expiration of July 31, 2004. This lease later was amended and restated so that ultimately SUNY is leasing approximately 200,000 square feet (roughly 70%) from TM.

At the time TM and SUNY executed the lease, the New York State Finance law required that all leases with the State of New York contain an executory clause. As such, the lease provided that

> This contract shall be deemed executory only to the extent of money available to the State for the performance of the terms hereof and no liability on account thereof shall be incurred by the State of New York beyond moneys available for the purpose thereof.

Plaintiff–Intervenors Hancock and WEA, respectively, hold a first and second mortgage on 315 Park Avenue South and security interests in the lease. Over a period of time, SUNY entered into various subordination, non-disturbance and attornment agreements with Hancock and WEA, which provided, in part, that SUNY would neither terminate nor modify its lease with TM without the written permission of the mortgage holders.

From 1989 and thereafter, SUNY explored various options to convert the College of Optometry to public space.[2] SUNY acknowledges that some of these options would have resulted in a cessation of lease payments prior to the lease's expiration in 2004.

At the same time that SUNY was pursuing its various relocation options, the City University of New York ("CUNY"), in 1994, went to the Division of Budget ("DOB") and sought an appropriation to purchase the B. Altman Building. CUNY sought to relocate its graduate center from its existing site at 42nd Street to the B. Altman Building and utilize the 42nd Street to consolidate other CUNY operations. In discussions between DOB and CUNY, the DOB suggested that the 42nd Street location be utilized by SUNY as its new permanent home, instead of being used by CUNY to consolidate other CUNY operations.[3] Between late 1994 and March 1995, SUNY and CUNY drafted and submitted a joint proposal to the DOB orchestrating the relocations and requesting state funding.

During the 1995 Legislative Session, Chapters 312 and 313 were passed into law. Chapter 312 reads, in relevant part:

> § 4. Notwithstanding any other provision of the law, no appropriation shall be available on or after July 1, 1996, or as soon thereafter as the state university college of optometry shall complete relocation to facilities owned and financed for public purposes, for funding support for privately or commercially leased building space for the state university college of optometry operations at 100 East 24th Street/315 Park Avenue South, in New York City, to reflect the elimination of such funding support due to fiscal deficiencies and unavailability of funds.[4]

Chapter 312 also authorizes the Dormitory Authority to finance the acquisition of property occupied by the CUNY Graduate School and University Center, for the use of the SUNY School of Optometry. Additionally, Chapter 313 authorizes the Dormitory Authority to acquire the B. Altman Building, into which the CUNY Graduate School and University Center will move as part of its consolidation plan.

On October 16, 1995, plaintiffs commenced this action seeking a declaratory ruling that

---

2. For instance, SUNY commenced an eminent domain proceeding against TM which was ultimately abandoned, and requested funding from the Division of Budget to exercise its purchase option on 315 Park Avenue South, which was denied. According to the plaintiffs, SUNY exploratory attempts were motivated by a desire to avoid New York City real estate taxes, and to move the operating costs of the College of Optometry to the state capital budget.

3. TM characterizes the DOB's request that the 42nd Street property be turned over to SUNY as a *quid pro quo* for the DOB's support of the B. Altman purchase for CUNY.

4. The lawyers for SUNY drafted this section of Chapter 312.

Chapter 312 of the Laws of 1995 violates the Contract Clause of the U.S. Constitution.[5] Pending on cross motions for summary judgment is the constitutionality of Chapter 312. TM asserts that Chapter 312 of the Laws is, as a matter of law, violative of the Contract Clause because it substantially impairs TM's unexpired lease with the State, and it is not reasonable and necessary to an important public purpose. Hancock and WEA join TM in this argument, and further assert that Chapter 312 violates the Contract Clause because it substantially impairs SUNY's subordination, non-disturbance and attornment agreements with Hancock and WEA.

Defendants, in turn, contend that: (1) plaintiffs' action presents no justiciable case and controversy; (2) the Eleventh Amendment bars suit against certain of the defendants; (3) plaintiffs bring only a state-law claim for breach of contract, and thus this Court lacks jurisdiction; (4) Chapter 312 is constitutional in all respects and (5) plaintiffs have not demonstrated their entitlement to a preliminary injunction. Further, defendants move for summary judgment in their own right to dismiss plaintiffs' claim that Chapter 312 violates the Due Process Clause of the Fourteenth Amendment.

At present, the SUNY School of Optometry remains at 315 Park Avenue Street. SUNY continues to make all rental payments due under the lease, and expects that occupancy will continue until at least June 30, 1999.

## II. DISCUSSION

### A. Standard For Summary Judgment

The standard for summary judgment is well-settled. A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of "informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). The initial burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

The nonmoving party may defeat the summary judgment motion by producing sufficient evidence to establish a genuine issue of material fact for trial. *See id.* at 322, 106 S.Ct. at 2552. The test for existence of a genuine dispute is whether a reasonable juror could find for the nonmoving party; that is, whether the nonmovant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

In ruling on a motion for summary judgment, a Court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs.,* 834 F.2d 54, 57 (2d Cir.1987). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Indeed, the nonmoving party's opposition may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (citations and quotations omitted).

It is with the foregoing standards in mind that the Court turns to the issues presented.

### B. Justiciability

■ As an initial matter, defendants argue that TM's complaint is not ripe for review.

---

**5.** Hancock and WEA intervened on November 15, 1996.

Specifically, defendants contend that TM has suffered no injury whatsoever, as SUNY has complied with the lease in all respects, and given no notice to plaintiff that it will not make rental payments in the future. Defendants further assert that because SUNY's move is dependent upon certain events, any issue that may arise if SUNY moves and stops paying rent is speculative and thus premature at this time.

TM, in contrast, asserts that by enacting Chapter 312, the State has eliminated its obligations under the lease, and changed a long-term contract into a month-to-month tenancy at the sole will of SUNY. According to TM, this transformation reduces the current value both of the lease and 315 Park Avenue South. Additionally, TM argues that it is threatened with imminent injury upon SUNY moving and ceasing to pay rent under the lease.

Article III, § 2 of the United States Constitution confers judicial power on courts to decide "cases" and "controversies." U.S. CONST. art. III, § 2. The doctrine of ripeness rests both on Article III concepts and prudential considerations. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 114, 96 S.Ct. 612, 680, 46 L.Ed.2d 659 (1976). The ripeness doctrine springs from the notion that "courts should not render decisions absent a genuine need to resolve a real dispute." Charles A. Wright & Arthur R. Miller, 13A Federal Practice & Procedure § 3532.1, at 114 (2d ed.1990). The classic test is whether there exists "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Lake Carriers Assn. v. MacMullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).

In the present case, the Court finds that the dispute is ripe to justify decision. As a result of the enactment of Chapter 312, TM already has suffered actual injury through both reduced lease and land values. Further, plaintiff suffers actual injury, as its ability to procure a future tenant is harmed as a result of the uncertain termination date of the lease.

TM also is threatened with imminent injury upon SUNY relocating to 42nd Street and terminating its lease obligations. Although SUNY presently is making all of its rental payments to TM, Chapter 312 eliminates all appropriations for such rental payments upon SUNY's move to 42nd Street. Moreover, there is little doubt that SUNY will relocate prior to the expiration of the lease. SUNY's move is far from a mere hypothetical situation. *See Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 297–98, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979). Indeed, much planning and thought has been given to SUNY's move, as evidenced by both the joint proposal of SUNY and CUNY and the subsequent enactment of Chapter 312 and its counterpart Chapter 313.

The Court thus finds that both actual injury and sufficient immediacy of injury warrant review of this controversy at this time.

■ Defendants next oppose plaintiff-intervenors Hancock's and WEA's motion for summary judgment by arguing that they lack standing to assert that Chapter 312 unconstitutionally impairs the TM–SUNY lease. Specifically, defendants argue that the plaintiff-intervenors can claim no personal injury to themselves as a consequence of the enactment of Chapter 312. This Court disagrees.

As holders of large security interests in the lease, Hancock and WEA have a personal stake in the outcome of this litigation. *See Valley Forge Christian College v. Americans United Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (stating Article III requires distinct injury, traceable to challenged action and likely to be redressed by favorable decision). The enactment of Chapter 312 immediately reduced the value of the TM–SUNY lease, and SUNY's relocation will render the lease worthless. By decreasing the value of the lease, the value of Hancock's and WEA's security interests in that collateral likewise is reduced. *See American Re–Insurance Co. v. Janklow,* 676 F.2d 1177, 1181 (8th Cir.1982) (holding security holder in lease had claim against state under Contract Clause for impairment of underlying lease); *Pioneer Com-*

*mercial Funding Corp. v. United Airlines, Inc.,* 122 B.R. 871, 886 (S.D.N.Y.1991). The Court therefore concludes that, as significant security holders in the lease, Hancock and WEA have a personal stake in the outcome of this litigation that justifies their continued participation.

## C. Eleventh Amendment

The Eleventh Amendment of the United States Constitution bars suits against a state in federal court unless the state consents to be sued, or Congress enacts legislation, pursuant to section 5 of the Fourteenth Amendment, overriding the state's Eleventh Amendment immunity.[6] *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 58, 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996); *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 2308–09, 105 L.Ed.2d 45 (1989). The "state" for purposes of the Eleventh Amendment generally includes state agencies and state officials sued in their official capacities, but not political subdivisions. *See, e.g., Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Although the Eleventh Amendment by its terms does not bar federal courts from hearing suits brought against a state by its own citizens, the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *See, e.g., Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974) (citations omitted). "This jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984).

The Supreme Court, in *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), recognized a special exception to the rule that the Eleventh Amendment bars suits against state officials. The *Ex Parte Young* doctrine provides that a state official, acting in his official capacity, may be sued in a federal court for prospective relief based on conduct which violates federal law. *Id.*; *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985); *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.1993). This holding is based on the fiction that a state cannot authorize its officers to act unconstitutionally. *Id.*

It also is hornbook law that state officers sued in their personal capacities may be sued in federal court because such suits are not against the state, but rather assert liability against the individual. *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Dube v. State Univ. of New York,* 900 F.2d 587, 595 (2d Cir.1990).

In the present case, plaintiffs bring suit against a number of different defendants under several theories of liability. For purposes of clarity, the Court addresses, in turn, each of the various defendants' asserted Eleventh Amendment defense.

### 1. Defendants State of New York, State University of New York and New York State Department of Audit and Control

■ Defendants argue that the Eleventh Amendment bars suit against defendants State of New York, State University of New York and New York State Department of Audit and Control. TM responds that although the Eleventh Amendment generally bars suit against such defendants, the New York Court of Appeals, in *Brown v. The State of New York,* 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996), effected an implied waiver of New York's Eleventh Amendment immunity.

It is firmly established that state waiver will be found "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman,* 415 U.S. at 673, 94 S.Ct. at

---

**6.** The Eleventh Amendment provides:

The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of Subjects of any Foreign State.

U.S. Const. amend XI.

1361 (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)); *see also Pennhurst State School and Hosp.*, 465 U.S. at 99, 104 S.Ct. at 907 (stating waiver should not be lightly inferred).

In the instant case, the Court is not persuaded that *Brown* effected an implied waiver of New York's Eleventh Amendment immunity. First, *Brown* addressed only the jurisdiction of the Court of Claims with regard to certain constitutional torts. *Brown*, 89 N.Y.2d at 184, 652 N.Y.S.2d 223, 674 N.E.2d 1129. Second, *Brown* involved violations of the New York State Constitution. *Id.* at 188, 652 N.Y.S.2d 223, 674 N.E.2d 1129 ("We conclude that a cause of action to recover damages may be asserted against the State for violation of the Equal Protection and Search and Seizure Clauses of the *State Constitution*.") (emphasis added). Here, plaintiff brings no state constitutional claim. Third, plaintiff does not cite to any precedent, nor is this Court aware of any, holding that *Brown* effected an implied waiver of the State's Eleventh Amendment immunity. Plaintiff's reliance upon *Brown* is therefore misplaced.

Because the Eleventh Amendment bars suit against defendants State of New York, State University of New York and New York State Department of Audit and Control, plaintiffs' claims against them are dismissed in their entirety.

### 2. Defendant New York State Dormitory Authority

Defendants argue that the Eleventh Amendment similarly bars suit against the New York State Dormitory Authority (the "Dormitory Authority"). Plaintiff TM, along with plaintiff-intervenors Hancock and WEA, by contrast, assert that the Dormitory Authority cannot claim sovereign immunity because the Dormitory Authority is not an arm of the State.

The so-called arm-of-the-state doctrine bestows sovereign immunity on entities created by state governments that operate as alter egos or instrumentalities of the states. *See, e.g., Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114

(1978). Whereas arms of the state are not subject to suit in federal court for alleged wrongdoing because of their close nexus with the state, political subdivisions such as counties and cities are not immune from suit under the Eleventh Amendment because of their autonomy from the state. *See Owen v. City of Independence, Missouri*, 445 U.S. 622, 650, 100 S.Ct. 1398, 1405, 63 L.Ed.2d 673 (1980); *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) *Moor v. County of Alameda*, 411 U.S. 693, 717–21, 93 S.Ct. 1785, 1799–1802, 36 L.Ed.2d 596, *reh'g denied*, 412 U.S. 963, 93 S.Ct. 2999, 37 L.Ed.2d 1012 (1973); *Lincoln County v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 363, 33 L.Ed. 766 (1890).

To determine whether an entity is an arm of the state, the Second Circuit has adopted a multi-factor analysis, borrowed in part from the Supreme Court. *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 292–96 (2d Cir.), *cert. denied*, ─── U.S. ───, 117 S.Ct. 481, 136 L.Ed.2d 375 (1996); *Feeney v. Port Auth. Trans–Hudson Corp.*, 873 F.2d 628, 630–31 (2d Cir.1989), *aff'd on other grounds*, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990); *see also Lake Country Estates, Inc.*, 440 U.S. at 391, 99 S.Ct. at 1172 (citing relevant factors for determining whether bi-state entity was state agency under the Eleventh Amendment). First, a court considers six factors, namely: (1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state. *Mancuso*, 86 F.3d at 293; *Feeney*, 873 F.2d at 630–31. Second, *if* these six factors "point in different directions," a court must then ask the following questions: "(a) will allowing the entity to be sued in federal court threaten the integrity of the state? and (b) does it expose the state treasury to risk?" *Id.* "If all the elements are evenly balanced," the controlling factor is "the vulnerability of the State's purse." *Id.*

(citing *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 51, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994)).

■ Initially, the Court notes that whether the Dormitory Authority is an arm of the State is a question of first impression in this circuit. *See Mancuso*, 86 F.3d at 294 (noting uncertainty of Dormitory Authority's status under the Eleventh Amendment). Although defendants contend that New York courts have held the Dormitory Authority to be an arm of the State, it is federal law that ultimately controls the question of Eleventh Amendment immunity. *Raymond Int'l Inc. v. M/T Dalzelleagle*, 336 F.Supp. 679, 681 (S.D.N.Y.1971); *Zeidner v. Wulforst*, 197 F.Supp. 23, 25 (E.D.N.Y.1961); 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3524, at 138 (2d ed.1990).

■ Applying the analysis set forth by the Second Circuit, the Court finds that the first, third, fifth and sixth factors each weigh against Eleventh Amendment immunity, while the second and fourth factors favor a finding of immunity. Both of the tie-break factors, however, weigh against immunity. Accordingly, the Court holds that the Dormitory Authority is not an arm of the State.

A review of the first factor—how the entity is referred to in the documents that created it—weighs against immunity. The statute refers to the Dormitory Authority as "a body corporate and politic constituting a public benefit corporation." N.Y. Pub. Auth. L. § 1677. *Cf. Lake Country*, 440 U.S. at 401, 99 S.Ct. at 1177 (referring to entity as a "political subdivision"). Such language "does little to advance [the] inquiry." *See Mancuso*, 86 F.3d at 293–94.

However, New York courts have concluded that the Dormitory Authority is not an alter ego of the State. *Dormitory Auth. of the State of New York v. Span Elec. Corp.*, 18 N.Y.2d 114, 118, 271 N.Y.S.2d 983, 218 N.E.2d 693 (1966); *Thompson Const. Corp. v. Dormitory Auth.*, 48 Misc.2d 296, 264 N.Y.S.2d 842, 846 (1965). These cases reason that the Dormitory Authority enjoys a separate existence from the State as it is financially independent, "transact[s] its own

business [and] hir[es] and compensat[es] its own personnel." *Id.*

The third factor—how the entity is funded—also weighs against immunity. To obtain funds for its purposes, the Dormitory Authority is authorized to borrow money and to issue negotiable bonds or notes payable from its revenues. N.Y. Pub. Auth. L. § 1678(11). Further, the bonds and other obligations do not expose the State to liability, as they are not a debt of the State. N.Y. Pub. Auth. L. §§ 1678(11), 1680(6), 1682 and 1683. The statute also provides that the monies of the Dormitory are to be maintained in the Dormitory Authority's separate accounts, with access limited to authorized officers. N.Y. Pub. Auth. L. § 1681. Thus, the Dormitory Authority operates as an independent financial entity.

The fifth factor—whether New York state has a veto power of the Dormitory Authority's actions—weighs against immunity. Although the comptroller may periodically inspect the Dormitory Authority's books, N.Y. Pub. Auth. L. § 1681(5), the statute does not grant a veto power to the State over the Dormitory Authority's actions. Further, although the governor appoints members to the Dormitory Authority's board, there is no evidence that the acts of the board are reviewable either by the governor or other State officers. *See Mancuso*, 86 F.3d at 294. The statute also vests the Dormitory Authority with the power to hire its own employees and fix their compensation. N.Y. Pub. Auth. L. § 1678(5). Thus the Dormitory Authority and its employees appear to operate free from State intrusion.

The sixth factor—whether a judgment against the Dormitory Authority will place the State treasury at risk—weighs against immunity. The New York Constitution provides that the State is not liable for the debts of public corporations such as the Dormitory Authority. N.Y. CONST. art. X, § 5. The statute further provides that the State is not a guarantor of the debts of the Dormitory Authority, which are payable only from the funds of the Dormitory Authority. N.Y. Pub. Auth. L. §§ 1681, 1683. Thus, the Court finds that the State's treasury is not placed at risk.

The second factor—how the governing members of the entity are appointed—weighs in favor of immunity. Of the seven member board, four are appointed by the governor with the advice and consent of the State Senate. N.Y. Pub. Auth. L. § 1677. The other three positions consist of the commissioner of education, the comptroller and the director of budget. Additionally, the governor is entitled to fill any vacancies which may occur. *Id.*

The fourth factor—whether the entity's function is traditionally one of state or local government—also favors a finding of immunity. The statute provides that "the dormitories of the authority are an essential part of the state educational system, [as] the authority will be performing an essential governmental function." N.Y. Pub. Auth. L. § 1685. In fact, the statute exempts the Dormitory Authority from paying taxes or assessments on the property it controls or the revenues it receives. *Id.* Additionally, the State exempts the Dormitory Authority from securing building permits from local governments. 19 Op. State Compt. 339 (1963).

The factors pointing in different directions, the Court now examines the purposes of the Eleventh Amendment. *Mancuso,* 86 F.3d at 293. This requires two inquiries. *Id.* The first inquiry—whether allowing suit exposes the State to liability—already has been resolved and needs no further discussion. The second inquiry—whether allowing suit will threaten the sovereignty of the State—also weighs against immunity.

The Dormitory Authority is a self-sustaining entity, which the legislature has accorded the power of a public entity. As such, it enjoys a largely autonomous existence. It may, among other things, sue and be sued, acquire real property in its own name, enter into contracts, hire employees, collect rentals and other charges for the use of the dormitories, borrow money and issue bonds. N.Y. Pub. Auth. L. § 1678. On the other hand, the Dormitory Authority requires association with the State by virtue of its nature. For instance, although the Dormitory Authority is authorized to enter into contracts, many such contracts are not effective unless approved by the State director of budget. N.Y. Pub. Auth. L. §§ 1680(2)(f), 1680(2)(g). Moreover, the statute terminates the Dormitory Authority's rights, transferring all title to real and personal property to the State, upon satisfaction of the Dormitory Authority's liabilities and bonds particular to each dormitory. N.Y. Pub. Auth. L. § 1694.

After careful review, however, the Court holds that the Dormitory Authority is not an arm of the State, and thus is not entitled to Eleventh Amendment immunity. Most compelling are findings that the Dormitory Authority is self-funding, subject to minimal State control and does not place the State treasury at risk. *Hess,* 513 U.S. at 51, 115 S.Ct. at 405–06; *Mancuso,* 86 F.3d at 292–96; *Feeney,* 873 F.2d at 631. This finding is consistent with other federal courts that have held analogous entities are not entitled to sovereign immunity. *Hess,* 513 U.S. at 51, 115 S.Ct. at 405–06 (holding that Port Authority Trans–Hudson Corp. not entitled to Eleventh Amendment immunity); *Mancuso,* 86 F.3d at 296–97 (finding that New York State Thruway Authority not entitled to sovereign immunity); *Matherson v. Long Island State Park Comm'n,* 442 F.2d 566, 567 (2d Cir.1971) (stating that Jones Beach State Park Authority not granted Eleventh Amendment immunity); *Raymond,* 336 F.Supp. at 681–82 (finding that Triborough Bridge and Tunnel Authority not entitled to Eleventh Amendment immunity).

### 3. Individual Defendants

■ Defendants posit that the named individuals in this case are immune from suit to the extent they are sued in their official capacities for other than prospective relief, and to the extent that they are sued for violations of state law.

The Court agrees, but notes that the plaintiffs seek only injunctive and declaratory relief barring the state officials from violating the Contract Clause and the Fourteenth Amendment of the United States Constitution. Thus such claims are properly before this Court. *See, e.g., Graham,* 473 U.S. at 167, 105 S.Ct. at 3105–06.

Similarly, plaintiffs' § 1983 claims against the individual defendants in their official ca-

pacities seek only prospective, declaratory and injunctive relief, and thus must stand. *See, e.g., Dube,* 900 F.2d at 595.

Plaintiffs' claims against the defendants in their individual capacities also are properly before this Court. *See, e.g., Dube,* 900 F.2d at 595.

### a) Summary

To review, defendants State of New York, State University of New York and New York State Department of Audit and Control are entitled to Eleventh Amendment immunity, and thus all claims asserted against them are dismissed. All remaining claims, seeking prospective relief based upon violations of federal law, against the Dormitory Authority and the individual defendants, both in their individual and official capacities, are properly before this Court.

### D. Chapter 312 of the Laws

#### i) Introduction

TM, Hancock and WEA argue that Chapter 312 of the Laws violates the Contract Clause of the United States Constitution.[7] Specifically, TM asserts that Chapter 312 substantially impairs the unexpired TM–SUNY lease, and is not reasonable and necessary to achieve an important public purpose. Hancock and WEA join TM in this argument, and further assert that Chapter 312 is unconstitutional because it substantially impairs SUNY's subordination, non-disturbance and attornment agreements with Hancock and WEA.

Defendants respond that although plaintiffs couch their claims in the nature of a contract impairment, plaintiffs actually seek to litigate a state-law breach of contract claim against SUNY. Accordingly, defendants maintain that this Court lacks jurisdiction to adjudicate this claim. Alternatively, defendants argue that Chapter 312 is constitutional in all respects, as Chapter 312 conforms with the executory clause in the lease contract, and is reasonable and necessary to achieve an important public purpose.

Defendants first argument raises a critical distinction, namely, that between a breach of contract and impairment of the obligation of a contract. Courts traditionally relied on the obligation/remedy distinction to make this determination. Simply stated, the difference between a breach of contract and an impairment of contract turns upon the availability of a damage remedy for the state's action. *Hays v. Port of Seattle,* 251 U.S. 233, 237, 40 S.Ct. 125, 126–27, 64 L.Ed. 243 (1920); *E & E Hauling, Inc. v. Forest Preserve Dist. of Du Page County, Illinois,* 613 F.2d 675, 679 (7th Cir.1980). If the state action precludes a damage remedy, the contract is impaired. *E & E Hauling, Inc.,* 613 F.2d at 679. If, however, the state action does not preclude a damage remedy the contract is considered merely breached because the payment of damages dissolves the obligation of the contract. *Id.*

More recent cases, however, cast doubt that availability of damages necessarily precludes impairment claims. *United States Trust Co. v. New Jersey,* 431 U.S. 1, 19–20 n. 17, 97 S.Ct. 1505, 1516 n. 17, 52 L.Ed.2d 92, *reh'g denied,* 431 U.S. 975, 97 S.Ct. 2942, 53 L.Ed.2d 1073 (1977) (referring to remedy/obligation distinction as "outdated formalism"); *Arriaga v. Members of the Bd. of Regents,* 825 F.Supp. 1, 6 (D.Mass.1992). These cases posit that impairment results when the state action "unreasonably and unnecessarily injure[s] the legitimate expectations" of the contracting parties. *See, e.g., Id.*

In the present case, application of either test results in the finding that the plaintiffs state a claim for impairment of contract. Applying the remedy/obligation test, TM likely cannot recover for breach of contract, for if TM sued for damages the defendants could claim that Chapter 312 prevents it from meeting its lease obligations. In short, Chapter 312 would be a complete defense to a suit for damages. *See E & E Hauling, Inc.,* 613 F.2d at 679 (espousing that "[u]se of law normally will preclude a recovery of

---

7. Article I, Section 10 of the United States Constitution reads, in pertinent part:

No state shall ... pass any ... law impairing the Obligation of Contracts....

U.S. Const. art. I, § 10, cl. 1.

damages because the law will be a defense to a suit seeking damages unless it is clear the law is not to have that effect"). Similarly, Chapter 312 would preclude any recovery in a breach of contract action by Hancock and WEA.

Applying the legitimate expectations test, plaintiffs expected the State to trigger the executory clause only if funds were not "available" within the meaning of the law. Plaintiffs also expected that the defendants would make a good-faith attempt to satisfy its lease obligations. Consequently, the Court holds that the plaintiffs have brought a Contract Clause claim, and accordingly now turns to address that issue.

In determining whether a statute violates the Contract Clause, the Supreme Court has counseled a two-step approach. *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109–10, 117 L.Ed.2d 328 (1992); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244–45, 98 S.Ct. 2716, 2722–23, 57 L.Ed.2d 727 (1978); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 14–22, 97 S.Ct. 1505, 1513–18, 52 L.Ed.2d 92 (1977); *Association of Surrogates v. State of New York*, 940 F.2d 766, 772 (2d Cir.1991), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). "The [first] inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *See, e.g. Energy Reserves Group, Inc.*, 459 U.S. at 411, 103 S.Ct. at 704. This inquiry, in turn, has three components: (a) "whether there is a contractual relationship, (b) whether a change in law impairs that contractual relationship, and (c) whether the impairment is substantial." *See, e.g., General Motors Corp.*, 503 U.S. at 186, 112 S.Ct. at 1110. If the statute in question substantially impairs the contractual relationship, the second inquiry is whether the statute is " 'reasonable and necessary to serve an important public purpose.' " *See, e.g., Association of Surrogates*, 940 F.2d at 772 (quoting *United States Trust Co.*, 431 U.S. at 25, 97 S.Ct. at 1519).

### ii) Substantial impairment?

In the present case the first component of the inquiry—whether there is a contractual relationship—is met. The parties do not dispute that SUNY entered into an unexpired lease contract with TM. Nor is there any question that SUNY entered into various subordination, non-disturbance and attornment agreements with Hancock and WEA.

The second component—whether Chapter 312 impairs that contractual relationship—presents a more difficult question. By its terms, upon SUNY's relocation Chapter 312 eliminates all appropriation for payment of its rental obligation. Plaintiffs argue that Chapter 312 thus substantially impairs the lease, as the statute eviscerates both TM's contractual expectations and rights. Hancock and WEA further argue that Chapter 312 impairs their subordination, non-disturbance and attornment agreements with SUNY. Pursuant to these agreements, SUNY agreed neither to terminate nor modify the lease without the written consent of Hancock and WEA. Accordingly, Hancock and WEA assert that Chapter 312 destroys their contract rights, because they never consented to the statute.

Defendants, in turn, set forth what appears an equally compelling argument. According to the defendants, Chapter 312 does not impair the lease because any actions taken pursuant to Chapter 312 conform with the executory clause contained in the lease contract. That clause provides as follows:

This contract shall be deemed executory only to the extent of money available to the State for the performance of the terms hereof and no liability on account thereof shall be incurred by the State of New York beyond monies available for the purpose thereof.

Defendants thus reason that by its terms the lease is terminable when, as in the instant case, a legislative determination is made that no monies are "available" to pay SUNY's rental fees. Defendants further contend that executory clauses are routinely enforced by New York courts; indeed, the executory clause is required to be in all State con-

tracts.[8] With respect to Hancock and WEA's claim that Chapter 312 violates the subordination, non-disturbance and attornment agreements, defendants assert that, *inter alia,* SUNY's agreements with Hancock and WEA are subordinate, and therefore subject to, all of the lease provisions.

These arguments correctly frame the pivotal inquiry; that is, to determine whether Chapter 312 impairs the lease, the Court must decide whether Chapter 312 properly triggers the executory clause contained in the lease. This issue requires a review of the legal effect of the executory clause as it relates to a legislative determination.

New York courts have enforced executory clauses when, in the course of ordinary budgeting procedures, funds are not made *"available."* *See, e.g., Amarnick v. State of New York,* 84 Misc.2d 112, 372 N.Y.S.2d 947, 951 *aff'd,* 52 A.D.2d 1007, 383 N.Y.S.2d 560 (3d Dept.1976); *Starling Realty Corp. v. State,* 286 N.Y. 272, 276–77, 36 N.E.2d 201 (1941). "The word 'available' in such context relates to the appropriation of funds by the Legislature and the allocation of such funds by the appropriate officer or body, such that the unavailability is dependent upon a legislative or budgetary determination or directive not to provide funds for the expenditure in question." *Forelli v. State of New York,* 179 A.D.2d 394, 577 N.Y.S.2d 844, 845 (1st Dept.1992) (citing *Starling,* 286 N.Y. at 272, 36 N.E.2d 201; *Amarnick,* 372 N.Y.S.2d at 947). As defined by other courts, "available" means "a request made by [a] responsible head of a department for [the] items only which are necessary to a proper and efficient administration of the department, and the approval of those items by the final budgetary authority." *Starling Realty Corp.,* 286 N.Y. at 278, 36 N.E.2d 201.

A review of the following New York cases is illustrative. First, in *Starling Realty Corp,* 286 N.Y. at 272, 36 N.E.2d 201, plaintiff filed an action to recover rent due under an unexpired lease with a state agency. The

state agency had vacated the plaintiff's premises and ceased paying rent prior to the lease's expiration. The State defended on the grounds that monies were not "available" within the meaning of the executory clause in the lease. In submitting its budget, the state agency did not request any funds for payment of the lease, as a decision had been made, in good faith and for sufficient reasons, to discontinue the branch office occupying the leased premises. The Court of Appeals held that no monies were "available" within the meaning of the executory clause, thus relieving the State from its rental obligations.

Second, in *Drislane v. State of New York,* 7 A.D.2d 141, 181 N.Y.S.2d 38 (3d Dept.1958), plaintiffs brought an action to recover rent allegedly due under a lease with the Division of Placement and Unemployment Insurance ("Division"). Prior to the lease's termination, the State removed all of the Division offices to a new building, and stopped paying rent to the plaintiff. The State contended that, pursuant to the executory clause in the lease, no monies were "available" for rental payments. *Id.,* 181 N.Y.S.2d at 39. The Division budget had proposed $2.3 million for rents for its various offices; however, the plaintiff's building had not been included in the budget.

The Third Department disagreed with the State that monies were not "available" within the meaning of the executory clause, as "funds continued to be received for rental of premises leased for the use of Division and that from those funds the State actually paid rental for space in the new building" now occupied by Division. *Id.* at 40. The court further noted that "[i]t is clear that the State's removal was for its own convenience and not because funds were unavailable." *Id.*

Third, in *Adson Ind., Inc. v. State of New York,* 28 A.D.2d 1183, 284 N.Y.S.2d 765 (3d Dept.1967), plaintiff brought suit against the State for allegedly due rental payments in-

---

**8.** Section 41 of the New York Finance law provides, in relevant part:

No state officer, employee, board, department or commission shall contract indebtedness on behalf of the state, nor assume to bind the state, in an amount in excess of money appropriated or otherwise lawfully available.

N.Y. Finance L. § 41.

curred by the Department of Public Works ("Department"). The State argued that it did not owe lease payments, because a legislative decision had been made that no monies were "available" for the rental payments within the meaning of the executory clause in the lease. *Id.*, 284 N.Y.S.2d at 766. Although the Department had submitted a budget requesting funds to pay the plaintiff, the Director of Budget deleted the appropriation request because the premises had been vacated.

The Third Department again held that the executory clause did not excuse the State from its rental obligations to the plaintiff. The court reasoned that because the State had moved to a public building where it continued to pay-out funds, "it cannot be said that there were no moneys available for that purpose." *Id.* at 767. The court also cited to *Drislane* for the proposition that "if there were moneys available to pay for new office space for the same State employees formerly housed in [plaintiff's] property, then there were moneys available for that purpose in the sense of the law and the executory clause did not apply." *Id.*

Fourth, in *Forelli*, 179 A.D.2d 394, 577 N.Y.S.2d 844, a landlord brought suit against the State for breach of the lease. The lease was entered into by the Office of General Services for the use by the Department of Labor and the Department of Taxation and Finance. The state agencies vacated the leased premises and ceased paying rent prior to the lease's termination. The State again defended on the grounds that, pursuant to the executory clause, no monies were "available" to meet its contractual obligations. *Id.* at 395, 577 N.Y.S.2d 844.

Although the First Department rejected the State's argument that funds were not "available" within the meaning of the executory clause, it declined to adopt the Court of Claims interpretation "of the executory clause as applicable only when an entire program is eliminated, such that it could never apply where a department is merely relocat-

ed. Such interpretation would lead to illogical results and unduly restrict the State in allocating admittedly limited resources." *Id.* Further, in finding that the executory clause did not apply, the court stressed that the decision to cancel the lease was not made pursuant to any legislative intention, but rather was made at the Departmental level without consideration of its outstanding contractual obligations. *Id.* at 396, 577 N.Y.S.2d 844.

■ These cases teach us several important rules. First, for the State to avoid its contractual obligations by reason of funds not being "available" within the meaning of the executory clause, the decision to withhold monies must have its source in a legislative or budgetary determination. *See, e.g., Forelli*, 577 N.Y.S.2d at 845; *Amarnick*, 372 N.Y.S.2d at 951. Second, *Starling* counsels that the executory clause may excuse nonperformance when a determination is made to withdraw all funding, thus shutting down a particular activity, branch agency office or operation. *Starling Realty Corp.*, 286 N.Y. at 278, 36 N.E.2d 201; *see also Amarnick*, 372 N.Y.S.2d at 951 (finding that executory clause properly excused State from contractual obligations with bottled water distributor when legislature decided to close down bottling plant).[9] Stated differently, the State may rely on the executory clause to excuse its existing contractual obligations when making substantive changes to a department, such as modifying, removing or changing operations to better accomplish its functions. *Id.* Third, *Drislane* and *Adson* instruct that even when a budgetary determination has been made that funds are not "available," an executory clause will not excuse nonperformance of the State's contractual obligations when funds continue to be received by the state agency for substantially the same substantive purpose. *Drislane*, 181 N.Y.S.2d at 39–40; *Adson*, 284 N.Y.S.2d at 768. In such instances, the State will not be permitted to

---

9. This holds true even if the decision to discontinue performance comes from that agencies departmental head by omitting funding from its budgetary proposal for the obligation in question; provided, of course, that the decision is made in good faith. *Starling*, 286 N.Y. at 276–77, 36 N.E.2d 201.

terminate a contract merely to suit its own convenience.[10] *Id.*

■ In the present case, Section 4 of Chapter 312 provides that monies are not "available" for the lease

> on and after July 1, 1996, or as soon thereafter as the state university college of optometry shall complete relocation to facilities owned and financed for public purposes ... to reflect the elimination of such funding support due to fiscal deficiencies and unavailability of funds.

Applying the principles articulated above, Chapter 312 does not trigger the executory clause in the TM–SUNY lease. Although Chapter 312 purports to make a legislative determination that funds are not available due to fiscal deficiencies; in fact, it ties this determination to SUNY's unilateral decision to move to another location. Thus funds only become "unavailable" if SUNY decides that it is convenient for it to move out.

Chapter 312 also resembles the *Drislane* and *Adson* scenario. Here, the statute seeks no substantive modification of the purpose of the College of Optometry. *Starling Realty Corp.*, 286 N.Y. at 278, 36 N.E.2d 201; *Amarnick*, 372 N.Y.S.2d at 951. Rather, Chapter 312 seeks merely to transplant the school some eighteen blocks north of its present location. This is not sufficient reason to permit the State to disallow its legitimate contractual obligations. *Drislane*, 181 N.Y.S.2d at 39–40; *Adson*, 284 N.Y.S.2d at 768. The statute also states that monies will be made available for purposes of improving and maintaining the new facilities. Specifically, Chapter 312 provides a $17 million appropriation for the College of Optometry's moving costs, and Chapter 313 provides in excess of $80 million to acquire the B. Altman Building and relocate both institutions. As such, the Court disagrees that money is not "available" to the State to satisfy its lease obligations within the meaning of the executory clause. *Id.*

In addition, the Court finds that, by its terms, Chapter 312 does not state that money is presently unavailable to fund the TM–SUNY lease, or that such money necessarily will ever become unavailable. To the contrary, monies are available until some unspecified point after July 1, 1996 when SUNY decides to relocate. If SUNY never moves, then monies will be "available" for the remainder of the lease term. To date, SUNY makes all lease payments to TM as they become due. SUNY also expects to fulfill all future rental payments that become due prior to its move.

■ With this understanding of how Chapter 312 functions, the Court cannot understand why funds are "available" to SUNY until the College of Optometry's departure, but that *if* SUNY departs, then funds suddenly will become "unavailable" due to fiscal deficiencies.[11] Also troubling is how the legislature, in 1995, could determine that fiscal deficiencies at some point in the unknown future will prevent the State from fulfilling its contractual obligations with the plaintiff. Such a determination does not square with ordinary budgeting procedures in which budgets are prepared only for the forthcoming fiscal year. *Amarnick*, 372 N.Y.S.2d at 951; *Starling Realty Corp.*, 286 N.Y. at 276–77, 36 N.E.2d 201.

Consequently, Chapter 312's assertion that funds are not "available" is insufficient to trigger the executory clause in the lease.[12]

10. The First Department's decision in *Forelli*, however, contains language that may be inconsistent with such an approach. *Forelli*, at 395–96, 577 N.Y.S.2d 844. Although *Forelli* held that the executory clause did not apply to that case, the court also provided that an executory clause could be applicable under circumstances when a state agency merely relocated. *Id.* This Court, however, views such a statement as dicta and therefore will not speculate as to whether this case presents such circumstance.

11. It would be error for the State to argue that funds are not available when the College of Optometry relocates because of expenses associated with the new premises. *Drislane* and *Adson* plainly stand for the proposition that the State cannot rely on an executory clause to avoid its lease obligations by simply relocating and spending these funds on more convenient premises. *Drislane*, 181 N.Y.S.2d at 39–40; *Adson*, 284 N.Y.S.2d at 768.

12. Therefore, the Court need not address defendants' arguments that the subordination, nondisturbance and attornment agreements incorporated by reference the lease.

The Court is mindful that the executory clause is "intended to be utilized as a shield against the imprudent use of taxpayers' dollars and not as a sword to divorce the State, for purposes of its own convenience, from a contract fairly entered into and honestly performed." *Green Island Contracting Corp. v. State of New York*, 117 Misc.2d 435, 458 N.Y.S.2d 828, 831 (N.Y.Ct.Cl.1983), *aff'd*, 99 A.D.2d 330, 473 N.Y.S.2d 55 (3rd Dept.1984), *appeal denied*, 66 N.Y.2d 605, 498 N.Y.S.2d 1025, 489 N.E.2d 770 (1985); *see also Forelli*, 577 N.Y.S.2d at 845.

■ Because the executory clause does not apply, the Court finds that section 4 of Chapter 312 impairs the plaintiffs' contracts. Turning to the third component of the inquiry, whether the impairment is substantial, only requires brief comment. With respect to TM, Chapter 312 clearly works a substantial impairment to the TM–SUNY lease. By its terms, Chapter 312 eliminates the State's obligations under the lease, and changes a long-term contract into a month-to-month tenancy at the sole will of SUNY. This transformation reduces the current value both of the lease and 315 Park Avenue South. Further, the lease will become substantially impaired when SUNY moves to its new location and stops making its rental payments. *See Haley v. Pataki*, 883 F.Supp. 816, 825 (N.D.N.Y.1995).

With respect to Hancock and WEA, SUNY agreed pursuant to the subordination, non-disturbance and attornment agreements that it would neither terminate nor modify the TM–SUNY lease without the written consent of Hancock and WEA. Notwithstanding, SUNY developed, proposed and actively lobbied for the legislation that became Chapter 312. Indeed, SUNY's attorneys drafted section 4 of Chapter 312 that purports to substantially modify or eliminate SUNY's obligations to TM under the lease. Yet neither SUNY nor the State obtained the written consent of Hancock or WEA prior to Chapter 312's enactment. Thus, Chapter 312 substantially impaired Hancock and WEA's rights to consent to modification or termination of the lease.

### iii) Reasonable and Necessary to Serve an Important Public Purpose?

■ An impairment of a contract may be constitutional if the statute is reasonable and necessary to serve an important public purpose. *United States Trust Co.*, 431 U.S. at 25, 97 S.Ct. at 1519. As a general rule, courts will defer to legislative judgment in determining whether particular actions are reasonable and necessary. *Id.*; *Association of Surrogates*, 940 F.2d at 771 (stating that legislation that "impairs the obligations of private contracts is tested under the contract clause by reference to a rational-basis test"). "But courts are not so deferential when the state's legislation is self-serving and impairs the obligations of *its own* contracts." *Association of Surrogates*, 940 F.2d at 771 (emphasis in original). As noted by the Supreme Court, "a government can always find use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." *U.S. Trust Co.*, 431 U.S. at 25–26, 97 S.Ct. at 1519.

■ In the instant case, defendants argue that Chapter 312 is reasonable and necessary to serve an important public purpose. Defendants posit that the statute eliminates costs and inadequate leased space, provides new facilities to benefit its academic mission and assists the College of Optometry in its provision of publicly assisted health care. Plaintiffs, by contrast, maintain that these reasons are insufficient to justify Chapter 312. According to the plaintiffs, less oppressive methods are available to the defendants to achieve its purposes.

Assuming that cost savings [13] and meeting the school's mission constitute an "important public purpose," it was not necessary for Chapter 312 to abrogate the State's rental obligations to accomplish these objectives. *See U.S. Trust Co.*, 431 U.S. at 31, 97 S.Ct. at 1522 (finding that the repeal of statutory bond covenant relied upon by bond purchas-

---

**13.** Plaintiffs argue that the State has entirely failed to establish that SUNY's relocation to pub-

lic space will save the State any money through 2004.

ers was not reasonable and necessary when "an evident and more moderate course would serve its purposes equally well"); *Condell v. Bress,* 983 F.2d 415, 420 (2d Cir.1993) (concluding that fiscal deficiencies did not require lag payroll to finance the expansion of the state court system); *Association of Surrogates,* 940 F.2d at 771 (same). Rather, a menu of alternatives was available to the State to accomplish its relocation plan while also satisfying its rental obligations. For example, taxes could have been raised or other programs cut to ensure the availability of funds for the lease. *Association of Surrogates,* 940 F.2d at 773. Alternatively, the State could simply have delayed the move of the College of Optometry until the year 2004. In the same vein, the State might have arranged for another tenant to occupy the premises on a temporary basis.

It also will not become "necessary" for the State to stop paying its rent because of fiscal deficiencies. By its terms, Chapter 312 purports that funds become "unavailable" due to fiscal deficits when SUNY decides to move to its new location at some unspecified point in the future. The State does not allege, however, that a financial crisis exists now, or what basis it has to know that a financial crisis will occur in the future. This Court does not possess the ability to predict when a fiscal crisis will occur, and doubts that the State possesses such ability either.[14] Accordingly, surmised fiscal deficiencies do not provide the necessity required to permit the State to escape its contractual obligations under the Contract Clause. *See Association of Surrogates,* 940 F.2d at 773–74 (finding that *present* fiscal deficiencies were insufficient to permit the State to avoid obligations).

Although the TM–SUNY lease may not best suit the needs of SUNY and the College of Optometry, "the contract clause bars such expedient *post hoc* changes in contractual obligations, for a state is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." *Association of Surrogates,* 940

F.2d at 773 (citing *United States Trust Co.,* 431 U.S. at 30–31, 97 S.Ct. at 1522). Indeed, when, as in the instant case, the State "enters into a contract it cannot simply walk away from its financial obligations." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 412 n. 14, 103 S.Ct. 697, 705 n. 14, 74 L.Ed.2d 569 (1983). "If a state contract could so cavalierly disregard the obligations of its own contracts, of what value would its promises ever be?" *Association of Surrogates,* 940 F.2d at 774. Accordingly, the Court holds that Section 4 of Chapter 312 is not reasonable and necessary to serve an important government interest.

■■■ In sum, the Court finds that Section 4 of Chapter 312 violates the Contract Clause of the federal constitution. However, the Court need not declare Chapter 312 wholly unconstitutional, as unconstitutionality of part of a statute does not necessarily defeat the validity of its remaining provisions. *United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968); *Champlin Refining Co. v. Commission,* 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1932); Singer, 1 Sutherland Statutory Construction § 2.06, at 33 (5th ed.1994). Rather, the remainder of the statute should be sustained, "unless the invalid provisions are deemed so essential, and are so interwoven with others, that it cannot reasonably be presumed that the legislature intended the statute to operate otherwise than as a whole." *Moore v. Fowinkle,* 512 F.2d 629, 632 (6th Cir.1975). Here, the Court discerns no reason why the remainder of Chapter 312 should not be sustained to permit CUNY and the College of Optometry to continue with their relocation and consolidation plans.

### E. Fourteenth Amendment

Because section 4 of Chapter 312 violates the Contract Clause, the Court need not decide whether the statute also violates the Fourteenth Amendment.

---

14. Even assuming a fiscal crisis fortuitously occurs simultaneously with SUNY's move to prevent SUNY from meeting its rental obligations, the Court does not understand how, as Chapter

312 asserts, there is nonetheless ample money available to fund both the B. Altman Acquisition and relocation of the College of Optometry.

## III. CONCLUSION

For the reasons stated herein, defendants' cross motion for summary judgment is GRANTED insofar as defendants seek to dismiss the plaintiffs' claims against the State of New York, State University of New York and New York State Department of Audit and Control. All remaining claims, seeking prospective relief based upon violations of federal law, against the Dormitory Authority and the individual defendants, both in their individual and official capacities, are properly before this Court. Further, defendants' motion for summary judgment is DENIED insofar as it seeks any other relief.

Plaintiffs' motions for summary judgment are GRANTED insofar as they seek a declaration that section 4 of Chapter 312 is void under the Contract Clause, and to enjoin the defendants from terminating payments to TM Park pursuant to the lease under the authority of Chapter 312. However, the Court holds that the remainder of Chapter 312 does not impair plaintiffs' contracts, and thus insofar as plaintiffs seek a declaration that the remainder of Chapter 312 is unconstitutional, plaintiffs' motions for summary judgment are DENIED.

**IT IS SO ORDERED.**