TM PARK AVENUE ASSOCIATES,
Plaintiff,

W.E.A. Associates, Plaintiff–Intervenor,

John Hancock Mutual Life Insurance
Company, Plaintiff–Intervenor,

v.

George E. PATAKI, Individually and as Governor of the State of New York; H. Carl McCall, Individually and as the Comptroller of New York State; New York State Department of Audit and Control; State University of New York; Frederick Salerno, Individually and as Chairman of the Board of Trustees of the State University of New York; Board of Trustees of the State University of New York; Thomas A. Bartlett, Individually and as Chancellor of the State University of New York; Lonnie Clar, Individually and as Associate Counsel to the State University of New York; Irving Freedman, Individually and as Vice Chancellor of Capital Facilities of the State University of New York and General Manager of the State University Construction Fund; New York State Dormitory Authority; the State of New York, Defendants.

No. 95–CV–1480.

United States District Court,
N.D. New York.

March 25, 1999.

Office of Ronald H. Sinzheimer, Albany, NY (Ronald H. Sinzheimer, of Counsel) Stroock, Stroock Law Firm, New York, NY (Leonard Boxer, of Counsel), for Plaintiff TM Park Ave. Associates.

Rosenman & Colin, LLP, New York, NY (David J. Mark, of Counsel), for plaintiff-intervenor W.E.A. Associates.

Debevoise & Plimpton, New York, NY (P. Bradley O'Neill, of Counsel), for plaintiff-intervenor John Hancock Mutual Life Ins. Co.

Dennis C. Vacco, Attorney General of the State of New York, Albany, NY (Steven H. Schwartz, Asst. Atty.Gen., of Counsel), for defendants.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

### A. Facts

This case arises from a lease dispute between plaintiffs and defendant-lessee the

State University of New York ("SUNY"). The facts are well-known and addressed in *TM Park Ave. Assocs. v. Pataki,* 986 F.Supp. 96 (N.D.N.Y.1997), familiarity with which is assumed.

In brief, in April 1986, plaintiff TM Park Avenue Associates ("TM Park") leased space at 315 Park Avenue South in New York City to SUNY's College of Optometry. The lease term ran from April 1986 to July 2004.

In 1989, SUNY began exploring options to convert the College of Optometry to public space. In late 1994 and early 1995, SUNY and the City University of New York ("CUNY") drafted and submitted a joint proposal to the Division of Budget ("DOB") for the relocation of both schools. Essentially, the proposal had CUNY consolidating its operations at new property to be purchased, and SUNY relocating to CUNY's present location.

During the 1995 Legislative Session, Chapters 312 and 313 were passed into law, which orchestrated the relocation plans. Section four of Chapter 312 provided, in relevant part, as follows:

> Notwithstanding any other provision of the law, no appropriation shall be available on or after July 1, 1996, or as soon thereafter as the state university college of optometry shall complete relocation to facilities owned and financed for public purposes, for funding support for privately or commercially leased building space for the state university college of optometry operations at 100 East 24th Street/315 Park Avenue South, in New York City, to reflect the elimination of such funding support due to fiscal deficiencies and unavailability of funds.

Chapter 313, in turn, authorized the Dormitory Authority to acquire property into which CUNY would move as part of its consolidation plan.

### B. Procedural History

TM Park, joined by plaintiff-intervenors John Hancock Mutual Life Insurance Company and W.E.A. Associates (collectively, the "plaintiffs"), initiated this action seeking, inter alia, a declaratory ruling that Chapter 312 of the Laws of 1995 ("Chapter 312) violates the Contract Clause of the federal Constitution. Thereafter, plaintiffs moved for summary judgment asserting that Chapter 312 of the Laws is violative of the Contract Clause because it substantially impairs TM's unexpired lease with the SUNY. Defendants opposed plaintiffs' motion and cross-moved for summary judgment in their own right. The Court granted in part and denied in part each parties' motion.

Relevant here is that part of the Court's decision which granted plaintiffs' motion for summary judgment declaring section 4 of Chapter 312 void under the Contract Clause. It is based upon that finding that plaintiffs now move for attorneys' fees pursuant to 42 U.S.C. § 1988, asserting that a violation of the Contract Clause is actionable under 42 U.S.C. § 1983. Alternatively, plaintiffs contend that they are entitled to summary judgment on their 42 U.S.C. § 1983 claims for violations of procedural and substantive due process under the Fourteenth Amendment of the federal Constitution. Defendants, in turn, oppose plaintiffs' request for attorneys' fees and cross-move for dismissal of plaintiffs' section 1983 claims based upon either the Contract Clause or the Due Process Clause.

## II. DISCUSSION

### A. Whether a Contract Clause Claim is Actionable Under Section 1983

■ Plaintiffs seek attorneys' fees and expenses pursuant to 42 U.S.C. § 1988 [1] based on the Court's previous determina-

---

1. Section 1988 provides that:
   "in any action or proceeding to enforce a provision of section[ ] 1983 ... of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.

tion that Chapter 312 violated the Contract Clause of the Federal Constitution. Defendants oppose plaintiffs' fee application asserting that the Court's prior ruling on the Contract Clause does not give rise to a section 1983 claim and, therefore, plaintiffs may not recover attorneys' fees and expenses under section 1988. The question presented, therefore, is whether a section 1983 claim lies for a violation of the Contract Clause. For the reasons to follow, the Court holds that a claim alleging violation of the Contract Clause can be brought pursuant to 42 U.S.C. § 1983.

This issue was first addressed in *Carter v. Greenhow,* 114 U.S. 317, 5 S.Ct. 928, 29 L.Ed. 202 (1885). In *Carter,* the State of Virginia passed legislation in 1879 "to provide a plan of settlement of the public debt" whereby the state issued bonds and coupons. 5 S.Ct. at 929. Carter owed taxes to the state and, in satisfaction thereof, tendered coupons cut from the bonds. Pursuant to an 1882 state legislative enactment that forbade tax collectors from accepting anything other than "gold, silver, United States treasury notes, and national bank currency," the state refused to accept the coupons. *Id.* The state thereafter entered upon, seized, and sold Carter's property in satisfaction of the outstanding tax payments. Carter then brought an action for trespass on the case against the treasurer of the City of Richmond, Virginia. In his complaint, Carter alleged that the 1882 statutory enactment was "repugnant to the constitution of the United States, and [is] therefore void." *Id.* According to Carter, his rights "derive[d] from the contract with the state, contained in the act of March 28, 1879, and the bonds and coupons issued under its authority." *Id.* The Complaint specifically stated that "in refusing to receive said coupons and money in payment of said taxes, and in levying on and seizing plaintiff's property for said taxes ... the defendant deprived the plaintiff of a right secured to him by the constitution of the United States, under color [of law] ... to the damage of the plaintiff two hundred dollars." *Id.* The question before the Court was whether the federal courts had jurisdiction and, thus, whether "the facts stated in plaintiff's declaration constitute a cause of action within the terms of [section 1983]." *Id.* at 930; *see McGahey v. State of Virginia,* 135 U.S. 662, 10 S.Ct. 972, 978, 34 L.Ed. 304 (1890).

In discussing the matter, the *Carter* Court stated:

> How and in what sense are these rights secured to him by the constitution of the United States? The answer is, by that provision, article 1, § 10, which forbids any state to pass laws impairing the obligations of contracts. That constitutional provision, so far as it can be said to confer upon or secure to any person any individual rights, does so indirectly and incidentally. It forbids passage by the states of laws such as are described. If any such are nevertheless passed by the legislature of a state, they are unconstitutional, null, and void. In any judicial proceeding necessary to vindicate his rights under a contract affected by such legislation, *the individual has a right to have a judicial determination declaring the nullity of the attempt to impair its obligation. This is the only right secured to him by that clause of the constitution.... And the only mode in which that constitutional security takes effect is by judicial process to invalidate the unconstitutional legislation of the state, when it is set up against the enforcement of his rights under his contract* .... Congress has provided no other remedy for the enforcement of this right.

5 S.Ct. at 930 (emphasis supplied).

While, upon initial impression, *Carter* seemingly holds that a claim for the violation of the Contract Clause may not be maintained under § 1983, *see Dennis v. Higgins,* 498 U.S. 439, 111 S.Ct. 865, 876, 112 L.Ed.2d 969 (1991) ("In our only previous case discussing a § 1983 claim brought for the violation of a supposed right se-

cured by Article I of the Constitution, we held that violation of the Contracts Clause does not give rise to a § 1983 cause of action." (Kennedy and Rehnquist, J.J., dissenting) (citing *Carter*, 114 U.S. 317, 5 S.Ct. 928, 29 L.Ed. 202); *Andrews v. Anne Arundel County*, 931 F.Supp. 1255, 1267 (D.Md.1996), *aff'd*, 114 F.3d 1175, 1997 WL 321573, *cert. denied*, —— U.S. ——, 118 S.Ct. 600, 139 L.Ed.2d 489 (1997), that is not so. The Supreme Court affirmed the dismissal of Carter's action upon the limited ground that Carter failed to state a claim under § 1983 because it only pleaded a breach of contract claim. *Carter*, 5 S.Ct. at 931; *Dennis v. Higgins*, 498 U.S. 439, 111 S.Ct. 865, 872 n. 9, 112 L.Ed.2d 969 (1991); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 99 S.Ct. 1905, 1914 n. 29, 60 L.Ed.2d 508 (1979) (Carter "held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress deprivation of the 'right secured to him by that clause of the Constitution' [the contract clause], to which he had 'chosen not to resort.' "); *McGahey*, 10 S.Ct. at 978. It, thus, could be argued that the *Carter* Court implicitly recognized that a claim for a violation of the Contract Clause *could* be brought pursuant to § 1983 assuming a properly pleaded Complaint.

A plaintiff asserting a cause of action pursuant to § 1983 must demonstrate, among other things, that he was deprived of a right, privilege, or immunity secured by the Constitution of the United States. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 2439, 85 L.Ed.2d 791 (1985) (Brennan, concurring); *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir.1994). This begs the question of what right, if any, is secured by the Contract Clause. *Carter* answered this stating that "the only right secured [by a violation of the Contract Clause]" is "judicial process to invalidate the unconstitutional legislation of the state." *Carter*, 5 S.Ct. at 931. Carter was not deprived of any Constitutional right because he did not seek a judicial declaration voiding the legislation; rather he only sought money damages. Thus, Carter's claim sounded in a common law breach of contract; not § 1983. *See Dennis*, 111 S.Ct. at 872 n. 9. In other words, because Carter failed to plead that he was deprived of a right guaranteed to him by the Contract Clause, he did not state a claim under § 1983. Accordingly, it becomes apparent that the *Carter* Court did not hold that § 1983 was not a proper avenue to redress a violation of the Contract Clause, but only that the facts in Carter's complaint failed to show a cause of action within § 1983's terms. *Carter*, 5 S.Ct. at 931.

More recent Supreme Court cases also support the conclusion that a claim alleging a violation of the Contract Clause may be pursued under § 1983. *See Dennis*, 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991). *Dennis* presented the question whether a claim under the dormant commerce clause, U.S. Const. Art. I, § 8, is actionable pursuant to § 1983. The Court expressly noted that section 1983's broad language covering "*any* rights, privileges, or immunities secured by the Constitution" mandates a broad construction. *Id.* at 868 (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 2032, 56 L.Ed.2d 611 (1978)) (emphasis in original). The *Dennis* Court rejected the notion that § 1983 claims be restricted to enforcing the protections of the Fourteenth Amendment and laws enacted pursuant thereto. *Id.* at 869. The Court then noted § 1983 covers not only personal rights, but also property rights. *Dennis*, 111 S.Ct. at 870. The *Dennis* Court also found that the dormant Commerce Clause does more than allocate power between the federal and state governments, but that it confers a right, privilege, or immunity within the meaning of § 1983 because "it is a substantive 'restriction on permissible state regulation' of interstate commerce." *Den-*

*nis,* 111 S.Ct. at 870 (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979)). The Court also noted that, although the Commerce Clause is a self-executing limitation on the states, individuals injured by state action that violate the dormant commerce clause may sue and obtain injunctive and declaratory relief. *See Dennis,* 111 S.Ct. at 870. Applying these principals and the factors outlined in *Golden State,* 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), for determining whether a federal statute confers a right within the meaning of § 1983[2], the *Dennis* Court found that a Commerce Clause claim can be brought under § 1983. *Dennis,* 111 S.Ct. at 873.

The foregoing analysis equally applies to a Contract Clause claim. Like the Commerce Clause, the Contract Clause confers a right, privilege, or immunity because it is a substantive restriction on permissible state legislation that would impair the obligation of contracts. *See Dennis,* 111 S.Ct. at 870, *see, e.g., Exxon Corp. v. Eagerton,* 462 U.S. 176, 103 S.Ct. 2296, 2305, 76 L.Ed.2d 497 (1983); *Sanitation and Recycling Ind., Inc. v. City of New York,* 107 F.3d 985, 992 (2d Cir.1997) ("[T]he Contract Clause is viewed as imposing 'some limits upon the power of a State to abridge existing contractual relationships.'") (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978)). Further, while the Contract Clause is a self-executing limitation on the power of the states, a person injured by state action that violates the Contract Clause may sue and obtain injunctive and declaratory relief. *See United States Trust Co. of New York v. State of New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52

L.Ed.2d 92 (1977); *Association of Surrogates and Supreme Court Reporters within City of New York v. State of New York* ("*Surrogates*"), 940 F.2d 766, 774 (2d Cir. 1991), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992).

The *Golden State* factors also weight in favor of finding a cause of action under § 1983. First, the Contract Clause does not express a mere preference for certain kinds of treatment, but clearly creates a binding obligation on government. That obligation is that states not pass laws impairing the obligations of contracts unless such laws serve a significant public purpose and the means chosen to accomplish this purpose are reasonable and appropriate. *See United States Trust Co. of New York v. State of New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 1517–19, 52 L.Ed.2d 92 (1977); *Sal Tinnerello & Sons, Inc. v. Town of Stonington,* 141 F.3d 46, 52 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 278, 142 L.Ed.2d 230 (1998). Second, plaintiffs' asserted interest is not too vague and amorphous to be beyond the competence of the judiciary to enforce. Rather, plaintiffs have a concrete interest in the contract that has been impaired. Courts certainly can grasp the obligations created by contracts (they do it all the time in breach of contract actions) and can enforce those interests by declaring the offensive legislation unconstitutional. Third, the Contract Clause was intended to benefit the plaintiffs herein. Like the Commerce Clause, the Contract Clause "of its own force imposes limitations on state [legislation] and is the source of a right of action in those injured by regulations that exceed such limitations." *Dennis,* 111 S.Ct. at 872;

---

**2.** These factors are:

[1] whether the provision in question creates obligations binding on the governmental unit or rather 'does no more than express a congressional preference for certain kinds of treatment.' *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981).[2] The interest the plaintiff asserts must not bee 'too vague and amorphous' to be 'be-

yond the competence and the judiciary to enforce.' *Wright v. City of Roanoke Redevelopment and Housing Auth.,* 479 U.S. 418, 107 S.Ct. 766, 774, 93 L.Ed.2d 781 (1987).[3] We have also asked whether the provision in question was 'intend[ed] to benefit' the putative plaintiff. 111 S.Ct. at 873 (quoting *Golden State,* 110 S.Ct. at 448).

*Carter,* 5 S.Ct. at 931 ("[T]he *individual* has a right to have a judicial determination declaring the nullity of the attempt to impair [the] obligation.") (emphasis supplied); *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978) ("The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts."); *Surrogates,* 940 F.2d at 771 ("[The Contract] [C]lause is 'one of the few "rights-protecting" provisions in the original Constitution', and has been called by one legal historian 'the bulwark of American individualism against democratic impatience and socialistic fantasy.'" (quoting G. Stone, L. Seidman, C. Sunstein & M. Tushnet, CONSTITUTIONAL LAW 1428 (1986) and H. Maine, POPULAR GOVERNMENT 247–48 (1885))).

Finally, the Supreme Court's conclusion in *Dennis* that the Commerce Clause supports a § 1983 action strongly suggests that the Contract Clause also is redressable under that section. As the dissent in *Dennis* aptly noted, unlike the Commerce Clause, the language that "[n]o state shall ... pass any ... Law impairing the Obligation of Contracts ... would provide some support for an argument that the Contracts Clause prohibits States from 'doing what is inconsistent with civil liberty.'" *Dennis,* 111 S.Ct. at 876 (quoting U.S. Const. Art. I, § 10; Cong. Globe 333 (Rep.Hoar) (Kennedy and Rehnquist, J.J., dissenting)). Thus, according to the dissent, the Contract Clause provides a more compelling basis for a § 1983 claim than the Commerce Clause.[3] *Id.* By logical extension, then, if the Commerce Clause is actionable under § 1983, then so must the Contract Clause.

The Second Circuit has not directly addressed whether a Contract Clause action may be maintained pursuant to § 1983.

*See Haley v. Pataki,* 106 F.3d 478, 482 (2d Cir.1997) (declining to decide whether Contract Clause is actionable under § 1983 because parties failed to raise the issue). The only circuit to directly address this issue is the Fourth, which affirmed the district court's decision, *inter alia,* not to entertain a Contract Clause claim under section 1983. *See Andrews,* 931 F.Supp. at 1267 ("I decline [ ] for the reasons stated at the hearing, and despite the cogency of plaintiffs' arguments to the contrary, to rule on the basis of a forecast that the Supreme Court will at its first opportunity expressly overrule *Carter v. Greenhow*."), *aff'd,* 114 F.3d 1175, 1997 WL 321573. It is unclear, however, from either the district court or Fourth Circuit's opinions in *Andrews* whether they considered *Dennis.* Furthermore, based upon the Court's above analysis of *Carter,* the Court disagrees with the District of Maryland and Fourth Circuit's belief that *Carter* held that a Contract Clause claim cannot be brought pursuant to § 1983.

Moreover, a number of courts, while not specifically addressing whether a Contract Clause claim is actionable pursuant to § 1983, impliedly accepted the position that it is by allowing Contract Claims to proceed under § 1983. *See Smith v. City of Enid,* 149 F.3d 1151, 1154 (10th Cir. 1998) (applying § 1983 statute of limitations to Contract Clause action); *Heart of America Grain Inspection Serv., Inc. v. Missouri Dept. of Agriculture,* 123 F.3d 1098, 1106 (8th Cir.1997); *Edwards v. City of Manchester,* 121 F.3d 695, 1997 WL 446785 (1st Cir.1997).

The Court, therefore, finds that alleged violations of the Contract Clause can be brought pursuant to § 1983.

**B. Whether Plaintiffs Properly Maintained a § 1983 Claim**

■ "In order to maintain a section 1983 action, two essential elements must

---

**3.** Of course, the dissent was not suggesting that a violation of the Contract Clause is ac-

tionable through section 1983.

be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell,* 13 F.3d at 547. Here, both elements are satisfied and the Court finds in favor of plaintiffs as a matter of law.

There is no question that there was action under color of state law. Further, the plaintiffs were deprived of a right guaranteed by the Constitution, namely Art. I, § 10. The Court previously found that Chapter 312(4) violated the Contract Clause because it substantially impaired the lease agreement and the legislation was not reasonable and necessary to serve an important public purpose. *TM Park,* 986 F.Supp. 96. Plaintiffs specifically sought a judicial declaration nullifying the repugnant legislation and, thus, they properly brought an action pursuant to § 1983 for a violation of the Contract Clause.

In fact, in its prior decision, the Court presumed that the action was brought pursuant to § 1983. *See Haley v. Pataki,* 901 F.Supp. 85, 87 (N.D.N.Y.) (McAvoy, C.J.) ("[T]his suit can be nothing other than an action pursuant to 42 U.S.C. § 1983, and the court will entertain it as such."), *aff'd,* 106 F.3d 478 (2d Cir.1997). Accordingly, plaintiffs have successfully maintained a § 1983 claim.

### C. Attorneys' Fees

It is well-settled that reasonable attorneys' fees are routinely awarded to prevailing parties in a § 1983 claim who obtain some significant measure of relief. *See LeBlanc–Sternberg v. Fletcher,* 143 F.3d 765, 769 (2d Cir.1998) (citations omitted); 42 U.S.C. § 1988(b). Plaintiffs are prevailing parties because they received actual relief on the merits of their claim. *See Gierlinger v. Gleason,* 160 F.3d 858, 880 (2d Cir.1998) (citing *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). In fact, they achieved their ultimate goal—a declaration that Chapter 312(4) is unconstitutional. "[A] plaintiff who ... obtained injunctive relief ... may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time." *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1940 n. 11, 76 L.Ed.2d 40 (1983). Thus, the Court finds that plaintiffs are entitled to an award of reasonable attorneys' fees.

"The process of determining a reasonable fee ordinarily begins with the court's calculation of a so-called 'lodestar' figure, which is arrived at by multiplying 'the number of hours reasonably expended on the litigation ... by a reasonable hourly rate.'" *LeBlanc-Sternberg,* 143 F.3d at 763–64 (quoting *Hensley,* 103 S.Ct. at 1939). The lodestar figure is to be based upon current, prevailing market rates. *Id.* at 764. The amount figured into the lodestar includes "the number of hours claimed by plaintiffs' attorneys that are supported by time records, that are not excessive or duplicative, and that do not reflect work done only in connection with unrelated claims on which plaintiffs did not succeed." *Id.* There is a strong presumption that this lodestar figure represents a reasonable fee under § 1988. *Id.*

Having arrived at a starting lodestar figure, the Court may adjust the lodestar, taking into consideration several factors. *See Hensley,* 103 S.Ct. at 1940 n. 9 (citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–18 (5th Cir.1974)). "[I]f the court excludes claimed hours from the calculation of the lodestar figure or augments or reduces that figure it must state its reasons for doing so as specifically as possible." *Id.* (internal quotations and citations omitted).

Plaintiffs seek the following in attorneys' fees and costs:

- $380,271.50 in legal fees, exclusive of a claimed 50% public policy enhancement, and $17,936.15 in expenses attributable to legal work performed by

the Sinzheimer Firm, attorneys for Plaintiff TM Park. These fees consist of 2107.00 hours of time at hourly rates ranging from $140.00 per hour to $190.00 hour;

- $37,848.00 in legal fees attributable to legal work performed by the Stroock Firm, attorneys for Plaintiff TM Park. These fees consist of 41.0 hours at a rate of $460.00 per hour and 37.6 hours at a rate of $505.00 per hour;

- $197,109.85 in legal fees and $23,-162.16 in expenses attributable to legal work performed by the Debevoise, Plimpton Firm, attorneys for Plaintiff–Intervenor John Hancock Mutual Life Insurance Company. These legal fees represent a total of 640.04 hours of attorney time and 42.4 hours of paraprofessional time at rates ranging from $65.00 per hour for staff to $518.26 per hour for partners; and

- $33,350.50 in legal fees and $1,661.45 in expenses attributable to legal work performed by the Rosenman Firm, attorneys for Plaintiff–Intervenor W.E.A. Associates. These legal fees represent 111.8 hours of attorney and paraprofessional time at rates ranging from $50.00 per hour to $325.00 per hour.

The defendants object to plaintiffs' fee application claiming that the hourly rates used are "extremely excessive," "the number of compensable hours claimed by plaintiff's counsel are also grossly excessive," and the billing records are not sufficiently detailed. Defendants further contend that the Sinzheimer Firm is not entitled to a public policy multiplier.

### 1. What Hourly Rates are Reasonable?

The hourly rate used in the lodestar calculation "should be 'in line with those [rates]' prevailing in the community for similar services of lawyers of reasonably comparable skills, experience, and reputation." *Cruz v. Local Union No. 3 of the Intern. Broth. of Elec. Workers,* 34 F.3d 1148, 1159 (2d Cir.1994) (quoting *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984)). The Second Circuit has instructed that "the 'prevailing community' the district court should consider to determine the 'lodestar' figure is 'the district in which the court sits,' unless there has been a showing that 'special expertise of counsel from a ... [different] district [was] required.'" *Id.* (quoting *Polk v. New York State Dep't of Correctional Servs.,* 722 F.2d 23, 25 (2d Cir. 1983)). Thus, the rate in the community in which the court sits forms the basis of the hourly rate unless: (1) the special expertise of non-local counsel was essential to the case; (2) local counsel was unwilling to take the case despite the plaintiff's diligent and good faith efforts to obtain such counsel; and (3) other special circumstances existed. *O'Grady v. Mohawk Finishing Prods., Inc.,* 1999 WL 30988, at * 2 (N.D.N.Y. Jan 15, 1999) (citing *In re: Agent Orange Product Liability Litigation,* 818 F.2d 226, 232 (2d Cir.1987)).

### a. Sinzheimer Firm

TM Park retained the Sinzheimer Firm, located in Albany, New York, to prosecute the instant litigation. The Sinzheimer Firm seeks reimbursment at rates ranging from $140.00 per hour for associates to $190.00 for partners. Since as far back as 1988, the reasonable hourly rates in this district have been $150.00 for partners, $100.00 for associates, $50.00 for paralegals, and a 50% reduction of the relevant hourly fee for travel time. *See Funk v. F & K Supply, Inc.,* 43 F.Supp.2d 205, 1999 WL 137855, at *21 (N.D.N.Y. 1999); *Auburn Enlarged City School Dist. v. Environmental Safety & Control, Inc.,* 1990 WL 19139, at *2 (N.D.N.Y. Feb. 27, 1990); *Schenectady News, Inc. v. City of Schenectady, New York,* 1988 WL 50653, at *1 (N.D.N.Y. May 17, 1988); *Macko v. General Motors Corp. Fisher Body Div.,* 1988 WL 73446, at *3 (N.D.N.Y. July 12, 1988).

Sinzheimer seeks to increase this district's hourly rates, essentially claiming

that the changing times require an upward adjustment. Sinzheimer argues that the rates used by the courts in this district are antiquated and do not reflect the prevailing community rates. In support of his contention, Sinzheimer submits affidavits of several local attorneys reflecting that their customary hourly rates are $200 per hour for partners and $150 per hour for associates.

Based upon the information contained in plaintiffs' affidavits, a review of the prevailing rates in nearby districts, and the Court's familiarity with the hourly rates charged by law firms in this District, the Court agrees that a rate of $150.00 for experienced attorneys and $100.00 for senior associates is no longer appropriate. *See Cityside Archives, Ltd. v. New York City Health and Hosp. Corp.*, 37 F.Supp.2d 652, 654 (D.N.J.1999) (rates of $175, $225, and $275 are reasonable); *Smith v. Philadelphia Housing Auth.*, 1999 WL 54565, at *3 (E.D.Pa. Jan.29, 1999) ($210 is reasonable); *Alnutt v. Cleary*, 27 F.Supp.2d 395, 399–400 (W.D.N.Y.1998) (rates between $120–$180 for associates are reasonable) (and cases cited); *Lieberman v. Dudley*, 1998 WL 740827, at *5 (D.Conn. July 27, 1998) ($250 per hour for civil rights attorneys is reasonable) (and cases cited). Rather, for civil rights attorneys with significant experience and numerous years of practice, including Sinzheimer, a rate of $175.00 per hour is appropriate. For associates with a reasonable amount of experience, a rate of $125.00 per hour is appropriate. The rate of $100.00 per hour should continue to be applied to newly admitted attorneys—that is, those who have been actively practicing for less than four years. Plaintiffs have offered no evidence that the rate of $50.00 applicable to non-lawyers should be adjusted and, therefore, that rate will remain.

#### b. Stroock Firm

■ The Stroock Firm was retained by TM Park as local counsel "because of the significance of the lease and the necessity of both minimizing damages and later of negotiating a settlement relative to this litigation." June 9, 1998 Aff. of Leonard Boxer, at ¶ 6. The Stroock Firm is located in the City of New York and claims to have had a normal and customary rate of $460.00 per hour, which was more recently increased to $505.00 per hour.

Defendants contend that the Stroock Firm should be limited to recovering Northern District rates. The Stroock Firm was retained because of its significant experience with real estate law in New York City, the location of the subject property. It was reasonable for TM Park to retain attorneys located in the same city as the property. Although the Strook Firm neither appeared nor actively participated in the instant litigation, it was actively involved in settlement negotiations in New York City that involved the same operative facts and circumstances as the instant litigation. The Strook Firm's efforts apparently resulted in a settlement agreement between TM Park and the defendants, but such agreement was rejected by the plaintiff-intervenors. Settlement negotiations often are part and parcel of the litigation process and, thus, the Court sees no reason to exclude the time expended by the Strook Firm. Further, the Strook Firm was not involved in the decision to lay venue in the Northern District and reasonably expected to be paid at New York City rates. Accordingly, the Court finds that Southern District rates should apply to the work performed by the Strook Firm and, accordingly, Leonard Boxer, a senior partner who runs the firm's real estate department, is entitled to reimbursement at a rate of $275.00 per hour. *See Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir.1999) ($225 is reasonable); *Broome v. Biondi*, 17 F.Supp.2d 230, 237–38 (S.D.N.Y.1997) ($250 is reasonable) (and cases cited therein); *Williams v. New York City Housing Auth.*, 975 F.Supp. 317, 323 (S.D.N.Y.1997) ($250 for junior partners, $200 for senior associates, $150 for mid-level associates, $135 for junior associates, $75 for student interns) (and cases

cited); *Ciner Mfg. Co. v. S.M. Gold Fashion Mfg. Corp.*, 1997 WL 193330, at * 3 (S.D.N.Y. Apr.21, 1997) ($300 for experienced partner and a range of $175 to $190 for associates).

### c. Debevoise Firm

■ The Debevoise Firm is located in New York City and represented plaintiff-intervenor John Hancock Mutual Life Insurance Company. The defendants again argue that rates attributable to work performed by the Debevoise Firm should be limited to the Northern District rates. Plaintiff–Intervenor John Hancock responds that it is entitled to New York City rates because: (1) it did not choose to venue this action in the Northern District, TM Park did; (2) the Debevoise Firm has represented John Hancock for more than ten years relating to New York real estate matters; (3) the Debevoise Firm represented John Hancock in connection with Hancock's initial purchase of its first mortgage on the subject property and several subsequent modifications of that mortgage and, therefore, had knowledge relevant to this litigation; and (4) the Debevoise Firm had appeared on behalf of Hancock in regard to the pending, related state litigation in New York City.

The Court agrees that the Debevoise Firm is entitled to Southern District rates because: (1) it was not responsible for laying venue in this district, but was required to participate in this litigation to protect their rights; and (2) while John Hancock could have retained local counsel, it did not make sense to do so in light of the Debevoise Firm's continued representation of Hancock over the years and, in particular, their familiarity with the particulars of the facts and circumstances surrounding the instant litigation. *See e.g. Polk*, 722 F.2d at 25. The fact that the Debevoise Firm represented an intervenor in this action does not require a different result. *See Wilder v. Bernstein*, 965 F.2d 1196, 1202 (2d Cir.1992), *cert. denied*, 506

U.S. 954, 113 S.Ct. 410, 121 L.Ed.2d 335 (1992). Accordingly, attorneys' fees for work performed by the Debevoise Firm will be awarded at the following hourly rates: $275.00 for partners; $200.00 for senior associates; $175.00 for junior associates; and $50.00 for paralegals.[4]

### d. Rosenman Firm

The Rosenman Firm also is a New York City Firm and represented Plaintiff–Intervenor W.E.A. Associates ("WEA"). WEA is the holder of a second mortgage and an assignment of rents at the subject premises. The Court finds WEA is entitled to an award of attorneys fees for work performed by the Rosenman Firm at the Southern District rates listed above. Rosenman had been representing WEA with respect to the subject premises for several years prior to the commencement of this litigation, WEA could not control the venue because it intervened in a pending action to protect its interests, and it would be pointless to have required WEA to retain local counsel merely to obtain lower hourly rates because the Rosenman Firm had familiarity with the relevant facts and circumstances.

### 2. Did the Firms Expend A Reasonable Amount of Time?

Having determined what hourly rates to apply, the Court must next assess whether the several law firms expended a reasonable amount of time in pursuing this litigation. The defendants contend that the law firms·spent an excessive amount of time litigating this matter. The defendants also argue that the billing records submitted by the law firms are not contemporaneous, they are inadequate and contradictory, and that they seek inappropriate rates for travel time.

### a. Are the Billing Records Contemporaneous?

Defendants argue that the billing records supplied to the Court are not contem-

---

4. These hourly rates notwithstanding, the Court will not award fees at rates higher than

those sought for work completed by specific attorneys at Debevois.

poraneous, but "a summary or reconstruction of the professional services rendered." This argument is without merit and was expressly rejected by the Second Circuit in *Cruz,* 34 F.3d at 1160. A "review of the submissions made by [the law firms] shows that they made contemporaneous entries as the work was completed, and that their billing was based on these contemporaneous records.... [T]his falls sufficiently within the meaning of 'contemporaneous.'" *Id.*

### b. Are the Billing Records Inadequate and Contradictory?

The defendants next argue that the billing records are inadequate because they are not sufficiently detailed to permit the Court to determine whether the hours claimed are reasonable. A proper fee application must be supported by detailed, contemporaneous time records demonstrating for each attorney the date, the hours worked, and the nature of the work done. *See New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983); *Lewis v. Coughlin,* 801 F.2d 570, 577 (2d Cir.1986).

A review of the billing records submitted by the Rosenman, Strook, and Debevoise Firms reveals that they are adequate. The billing records do not merely indicate, for example, "meeting," or "research," or "telephone call." Rather, the billing records properly give a brief, detailed description of the nature of the meeting, research, telephone call, or other activity billed. Thus, the records of these firms are not inadequate.

■ However, defendants correctly point out that some of the Sinzheimer Firm's billing entries are not sufficiently detailed. For example, several entries merely state "research." The Court has identified several similar instances of insufficient detail. To account for the insufficient entries, the Court will reduce the

total amount of hours attributable to Sinzheimer by 10%.

■ Defendants next claim that the billing entries are contradictory and contain "padding" of the hours expended on this case. In support of this contention, the defendants cite to instances where, for example, attorney "A" billed for a telephone call with attorney "B," but attorney "B" did not have a similar billing entry. Much of defendants complaints in this regard are aimed at the Debevoise Firm. The Debevoise Firm responds contending that "[g]iven the volume of telephone calls, it is not in any way surprising or suspicious that certain lawyers recorded a few telephone calls that other lawyers did not." The Court accepts the Debevois Firm's explanation. However, after reviewing the Debevois Firm's billing records, the Court has found excessive entries relating to tasks such as "Review, docket and diary documents; draft instructions to files." The Court cannot fathom why such a large amount of time needed to be expended upon such tasks and, therefore, the number of hours attributable to the Debevoise Firm will be reduced by 10%.[5]

■ Finally, the defendants contend that the hours billed by the Strook Firm are duplicative of the efforts expended by the Sinzheimer Firm. Indeed, a review of the billing records demonstrates that both the Strook and Sinzheimer Firms billed for settlement negotiations. The Strook Firm was primarily involved in settlement negotiations. In order to eliminate any possible "double billing," the Court will reduce Sinzheimer's total hours by forty-one hours.

### c. Travel Time

■ Defendants correctly note that travel time is generally reimbursed at one-half the prevailing hourly rate. *Funk,*

---

5. In calculating the lodestar, the Court will group billable hours according to the applicable hourly rate (*e.g.* (partner hours * partner rate) + (associate hours * associate rate)).

The Court will deduct the 10% from that group (*e.g.* partners or associates) with the highest number of billable hours.

1999 WL 137855, at *21. Review of the billing records demonstrates that the plaintiffs did not adjust their fee application to reflect this. Instead, the attorneys grouped all their hours together, travel time and all, and charged the full hourly rate.

The burden is on the plaintiffs to demonstrate the reasonableness of the attorneys' fees sought. *Hensley*, 103 S.Ct. at 1939–41. The Court should not be obligated to scour the voluminous billing records submitted, pull out all time entries related to travel, and make the requisite calculations. Rather, this was plaintiffs duty, subject to a review by the Court for reasonableness. *Id.* at 1939. Because the plaintiffs failed to do this; instead billing for travel time at the full hourly rate, the Court will reduce the number of reasonable hours claimed by each firm by an additional 5%.

### 3. The Lodestar Calculation

Applying the above-discussed hourly rates and reductions to the hours expended, the following constitutes the Court's lodestar calculation:

### a. Sinzheimer Firm

The Sinzheimer billed a total of 1,446.05 hours of partner time and 628.5 hours of associate time.[6] As previously discussed, the Court is disallowing 10% of Sinzheimer's total time due to billing records that were not sufficiently detailed, 5% for failure to correctly separate out travel time, and an additional 41 hours to avoid "double billing" of work performed by the Strook Firm. Accordingly, the Court adjusts partner time to a total of:

1,446.05  (.15)*(1,446.05)—41  =  1188.14.

This amounts to the following total:

(Partner hours)*(partner rate) + (senior associate hours)*(senior associate rate) + (junior associate hours) * (junior associate rate) = (1188.14 * $175.00) + (93.50 * $125) + (535 * $100) = $273,112.00 [7].

Plaintiffs also are entitled to disbursements incurred by the Sinzheimer Firm in the amount of $17,936.15 for a total of $291,048.15.

### b. Strook Firm

After reducing the total hours billed by the Strook Firm by 5% for the reasons discussed above, the award of attorneys' fees for work attributable to the Strook Firm is as follows:

(78.6 hours—0.05*(78.6)) * $275/hour) = $20,534.25

### c. Rosenman Firm

After deducting 5% from the total hours claimed, the award of attorneys' fees attributable to the Ronseman Firm is as follows:

Hours of David Mark: 108.7 hours—5% = 103.265 Hours of Brant Maller: 1.9

Paralegal Time: 1.2

Thus, applying the Souther District rates, the totals are:

(103.265 * $275) + (1.9 * $200) + (1.2 * $50) = $28,837.88.

The award of fees for the Rosenman Firm also includes an amount for disbursements equal to $1,661.45, for a total of $30,499.33.

---

**6.** The Court has disallowed 32.00 hours attributable to "JMW" and "KAL". The Court has no idea whether these individuals are attorneys, paralegals, or administrative staff. A review of the billing records demonstrates that the time spent by these two individuals consists of non-reimbursable office administration.

**7.** The hourly rate attributable to Deborah Howitt, Anthony Giardina, Jeffrey Dillabough, Tommasino Conte, and Dan DeLuna is $100.00 because of they have been admitted for less than four years. Peter Molinaro, an attorney with approximately 8 years experience, is entitled to a rate of $125.00. Ronald Sinzheimer, a practitioner of 24 years, is entitled to a rate of $175.00.

### d. Debevoise Firm

Applying the 15% reduction discussed above (10% for billing inconsistencies and 5% for improperly calculated travel time), the following calculations apply to the Debevoise Firm's billings:

55.2 hours of partner time at $275/hour [8] = $15,180.

486 hours of associate time at $200/hour [9] = $97,200—15%.[10]

0.3 hours of managing attorney time at $196/hour [11] = $58.80.

69 hours of associate time at $195/hour [12] = $13,455.00.

29.9 hours of associate time at $160/hour [13] = $4,784.00.

Thus, we get the following totals:

$15,180 + ($97,200—15%) + $58.80 + $13,455.00 + $4,784.00 = $116,097.8.

The Debevoise Firm also lists expenses in the amount of $23,162.16 for a final total of $139,259.96.

### e. The Lodestar Grand Total

Adding the lodestar fees for each firm, we get a lodestar grand total of:

$291,048.15 (Sinzheimer) + $20,534.25 (Strook) + $30,499.33 (Rosenman) + $139,259.96 (Debevoise) = $481,341.69.

The Court finds that this amount is reasonable in light of the facts that this case has been ongoing since 1995, there has been considerable discovery, the legal issues involved novel and difficult questions of law, and the plaintiffs obtained the exact relief sought. The Court, therefore, finds no reason to further reduce the lodestar amount.

■ Finally, the Court rejects the Sinzheimer Firm's request for a "public policy multiplier of 50%." The facts simply do not warrant such an augmentation to the lodestar. The judicial declaration that the subject legislation is repugnant to the United States Constitution in addition to the award of reasonable attorneys' fees adequately apprises the State of New York that it undertook unconstitutional action. Contrary to plaintiff's suggestion, it is not for this Court to "demonstrate to state government that this practice can no longer continue." If plaintiffs are unhappy with the actions taken by the state legislature and governor, their proper remedy is at the voting booth.

### D. Due Process Claims

Having found in favor of plaintiffs on the § 1983 cause of action claiming a violation of the Contract Clause, the Court need not decide whether plaintiffs' Fourteenth Amendment rights have also been violated.

## III. CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED IN PART insofar as they seek a determination that: (1) a Contract Clause claim may be brought pursuant to 42 U.S.C. § 1983; (2) they successfully maintained a § 1983 claim for a violation of their rights under the Contract Clause; and (3) they are entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988 in the amount of $481,341.69. Defendants' cross-motion for summary judgment is DENIED.

IT IS SO ORDERED

---

8. This includes billable hours for Alden and Wiles.

9. The includes billable hours for O'Neill, Ostrove, and Rubin.

10. Recall that the Court is reducing 15% from the group with the highest total billable hours.

11. This accounts for the time expended by Marmo, for whom the firm bills at a rate of $196/hour.

12. This includes time for Paltiel, Sauer, and Jacobson for whom the firm bills at a rate of $195/hour.

13. This accounts for the time expended by Sullivan, for whom the firm bills at a rate of $160/hour.